EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Xiomara Meléndez De León, et al.<br><br>Recurrida<br><br>v.<br><br>Hon. Julia Keleher, et al<br><br>Peticionaria | 2018 TSPR 126<br><br>200 ____ |
| Municipio de Morovis, et al.<br><br>Recurrida<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico, et al.<br><br>Peticionaria | |

Número del Caso: CT-2018-5

Fecha: 16 de julio de 2018

Tribunal de Apelaciones:

    Panel V

Oficina del Procurador General:

    Lcda. Carmen L. Sanfeliz Ramos
    Procuradora General Auxiliar

    Lcda. Isaías Sánchez Báez
    Procurador General

Abogados de la parte recurrida:

    Lcdo. Rafael Nadal Arcelay
    Lcda. Melissa López Díaz
    Lcdo. Edgardo Pabón Rodríguez
    Lcdo. José Chaves Caraballo

Materia: Sentencia del Tribunal con Opiniones de Conformidad y Opinión Disidente.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Xiomara Meléndez De León, *et al.*<br><br>Recurrida<br><br>v.<br><br>Hon. Julia Keleher, *et al.*<br><br>Peticionaria<br><br>_____<br><br>Municipio de Morovis, *et al.*<br><br>Recurrida<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico, *et al.*<br><br>Peticionaria | CT-2018-0005 |

**SENTENCIA**

(REGLA 50)

En San Juan, Puerto Rico, a 16 de julio de 2018.

Examinado el recurso de certificación intrajurisdiccional, así como los escritos presentados por la parte recurrida, revocamos la sentencia recurrida emitida por el foro de instancia a través de la cual se concedió el remedio del *injunction* permanente y se declaran las peticiones **sin lugar**. Como consecuencia, se deja sin efecto la orden de paralización del cierre de las escuelas objeto de este recurso y se desestima la demanda de autos.

Notifíquese inmediatamente.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Rivera García emitió una opinión de conformidad a la cual se unen el Juez Asociado señor Martínez Torres, la Jueza Asociada señora Pabón Charneco y el Juez Asociado señor Kolthoff Caraballo.

El Juez Asociado señor Colón Pérez emitió una opinión de conformidad a la cual se unió la Juez Asociada Rodríguez Rodríguez. El Juez Asociado señor Estrella Martínez disintió con opinión escrita. La Jueza Presidenta Oronoz Rodríguez disiente y hace constar la expresión siguiente:

"El 8 de febrero de 2018 se presentó el Proyecto de la Cámara 1441 para establecer la Ley de Reforma Educativa de Puerto Rico. En lo pertinente, el Artículo 2.04 establecía los deberes y responsabilidades de la Secretaria de Educación. En particular, el inciso (b)(14) reconocía la facultad de "[e]stablecer y regular la apertura, operación y cierre de las instalaciones donde operan las escuelas públicas de Puerto Rico". Este proyecto se discutió ampliamente en el País. A raíz de ello, se presentaron muchísimas ponencias ante la Comisión de Educación, Arte y Cultura. Tanto la Asociación de Maestros como la Federación de Maestros cuestionaron la falta de criterios para ordenar el cierre de una escuela pública.

Ante ello, se enmendó el inciso (b)(14) del Artículo 2.04 para establecer que "para el cierre, consolidación y/o reorganización de las instalaciones, el Secretario seguirá el procedimiento establecido en el Artículo 8.01, inciso (f) de esta Ley". Por su parte, el Artículo 8.01, inciso (f) dispone, en resumen, que previo al cierre de **cualquier escuela** la Secretaria de Educación deberá preparar un estudio. Ese estudio debe atender 15 criterios, entre estos, la localización y el impacto en la comunidad. Además, ese estudio debe estar disponible al público en el Distrito Escolar y la ciudadanía a través de la página de Internet del Departamento de Educación y enviarse al director de la escuela. La única excepción disponible para incumplir con este procedimiento es cuando se trate de un cierre temporal urgente y necesario para la preservación de la salud de los estudiantes o la seguridad general.

El Estado interpreta que tal proceso debe cumplirse a partir del 1 de julio de 2018. Según este, el cierre de 283 escuelas públicas que anunció en abril de 2018 —es decir, luego de aprobada la ley y antes del 1 de julio de 2018— no tiene que cumplir con el procedimiento. Esta interpretación es contraria al texto claro de la ley, su historial legislativo y propósitos. Interpretar que el cierre de más de 200 escuelas públicas no tiene que cumplir con un procedimiento que la propia ley dispone que aplica a "cualquier escuela" y cuya única excepción es en casos urgentes, es contrario a la

política pública que procura la ley y da al traste con el ideal de nuestro ordenamiento constitucional democrático de participación ciudadana y consentimiento de los gobernados.

La Asamblea Legislativa fue más allá de la exigencia constitucional y dispuso que, previo al cierre de una escuela, se debe efectuar el referido estudio. En este caso, al eximir al Estado de cumplir con su obligación con respecto a más de 200 escuelas públicas, este Tribunal modifica indebidamente ese acto legislativo. Con ello, empaña un curso de acción que, si bien es permisible, en este caso no cumple con las exigencias que impuso el legislador.

En efecto, la redacción del inciso (f) del Artículo 8.01 pudo ser mejor. Pero la interpretación del Tribunal es contraria a la regla de hermenéutica legal de que las palabras de una ley deben entenderse, siempre, de modo que produzcan algún resultado. La ley se refiere a "cualquier escuela", por lo que la pretensión de que el proceso no aplica a más de 200 escuelas, cuyos cierres para el nuevo año académico el Estado anunció posterior a la aprobación de la ley, es insostenible. El historial legislativo demuestra que ese proceso se promulgó para atender las preocupaciones de los maestros. Por lo tanto, no tiene sentido que no les apliquen los criterios a estas escuelas solo porque el cierre se anunció antes del 1 de julio de 2018. Ello porque el cierre es efectivo luego de esa fecha, es decir, cuando culmina el calendario escolar.

La interpretación que propone el Estado no se justifica ante la clara intención legislativa. En consecuencia, ante la determinación de este Tribunal de adoptar tal interpretación, disiento".

El Juez Asociado señor Feliberti Cintrón está inhibido.

Juan Ernesto Dávila Rivera
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Xiomara Meléndez De León, *et al.*<br><br>Recurrida<br><br>v.<br><br>Hon. Julia Keleher, *et al.*<br><br>Peticionaria<br><br>_____<br><br><br>Municipio de Morovis, *et al.*<br><br>Recurrida<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico, *et al.*<br><br>Peticionaria | CT-2018-0005 |

**Opinión de conformidad emitida por el Juez Asociado señor RIVERA GARCÍA a la cual se unen el Juez Asociado señor Martínez Torres, la Jueza Asociada señora Pabón Charneco y el Juez Asociado señor Kolthoff Caraballo**

En San Juan, Puerto Rico, a 16 de julio de 2018.

Este caso nos presenta una controversia cuya trascendencia es incuestionable para el desarrollo de ciudadanos que puedan contribuir al progreso económico y social de Puerto Rico. Nos confrontamos con la interrogante de si

procede expedir un *injunction* permanente para evitar el cierre de varios planteles escolares. En esencia, tenemos que justipreciar si el Estado transgredió las garantías constitucionales del debido procedimiento de ley y la igual protección de las leyes de los recurridos. En miras de esas interrogantes, venimos llamados a analizar las particularidades del derecho constitucional a la educación y uno de los cometidos más importantes del Estado, su responsabilidad de prestar servicios educativos a nivel primario conforme sus facilidades lo permitan de acuerdo al Art. II Sec. 5 de Nuestra Constitución.

A continuación trazaremos el marco fáctico y procesal de la controversia que nos atañe resolver.

**I**

El 24 de mayo de 2018 un grupo de padres compuesto por las Sras. Xiomara Meléndez De León, Joanna López Medina, Ivette M. Montalvo Mendoza, Carmen E. Rosario Rodríguez, Zuleyma Maldonado Sierra y el Sr. Rinaldi Fernández Pagán (padres demandantes) incoaron en el Tribunal de Primera Instancia una *Petición de injunction preliminar y permanente* contra el Estado, el Departamento de Educación (Departamento), su Secretaria, la Hon. Julia Keleher, y la Directora de la Región Educativa de Arecibo, la Sra. Maribel Colón González.[1] Alegaron que la decisión del Departamento de cerrar ciertos planteles escolares era improcedente pues se tomó en contravención a la

---

[1] Cada una de las partes demandantes arguyeron ser padres de estudiantes de las escuelas a ser cerradas.

Ley 85-2018, conocida como la *Ley de Reforma Educativa*, y la Carta Circular Núm. 33-2016-2017.[2] También, adujeron que el Departamento no efectuó el estudio requerido por la Ley 85, el cual requería evaluar un mínimo de quince criterios antes de cerrar, consolidar o reorganizar cualquier escuela. Aseveraron que el Departamento no colocó el estudio a la disposición del público del distrito escolar de los planteles escolares que se proponía cerrar. Sostuvieron que las clausuras de esas escuelas no respondían a una situación urgente y necesaria para la preservación de la salud de los estudiantes o la seguridad en general. Además, argumentaron que el Departamento, al incumplir con la ley, violó su debido proceso de ley y su derecho a la igual protección de las leyes. Peticionaron la expedición de un *injunction* preliminar y permanente. Señalaron que la ilegalidad del cierre de los planteles escolares les ocasionaba un daño irreparable puesto que el Departamento no permitió que sus hijos se matricularan en ellas. Indicaron que el cierre representaba una carga altamente onerosa ya que para llegar a las escuelas tenían que trasladarse a mayores distancias.

Consecuentemente, el foro primario dictó una *Orden* en la que citó a todos los codemandados a una vista de interdicto preliminar a celebrarse el 1 de junio de 2018. Luego de llevarse a cabo la vista, y tras estudiar una moción de

---

[2] Los planteles a ser cerrados son los siguientes: Laurentino Estrella Colón de Camuy, Joaquín Rodríguez Ruiz de Hatillo, Ramón Ávila Molinari de Quebradillas, Rosa M. Rodríguez de Vega Baja, Ramón E. Betánces de Arecibo y Julio Lebrón Soto de Lares.

desestimación instada por el Estado, emitió una *Resolución y orden* en la cual esbozó que no procedía por ser prematura. Apuntó que, según la prueba sometida, la actuación del Departamento de cerrar escuelas rayó en lo arbitrario y caprichoso en la notificación a las partes. Expresó que los testimonios vertidos presentaban una incertidumbre respecto al cierre, especialmente en los padres de niños de educación especial. Determinó que esta constituía un daño irreparable emocional. Estimó que la forma en que se enteraron los testigos del cierre, por la página de Facebook del Departamento o por la aplicación Whatsapp, no constituía una manera adecuada para notificar el posible menoscabo de un derecho fundamental adquirido como lo es la educación. Reconoció que la educación ostentaba un rango constitucional y que los estudiantes, los padres y los maestros poseían una "expectativa" de derechos adquiridos. Señaló que, conforme a los reglamentos y cartas circulares del Departamento, había una guía para ejecutar el cierre de los planteles escolares y que los padres demandantes evidenciaron que existía duda sobre si el Departamento cumplió con los procesos establecidos. Acto seguido, el foro de primera instancia ordenó a la Directora Regional de Arecibo que cesara y desistiera de todo trámite para cerrar las seis escuelas. Finalmente, requirió al Gobierno que compareciera a una vista que se llevaría a cabo el 11 de junio de 2018 donde debía desfilar prueba sobre el cumplimiento con la reglamentación que aplicaba para determinar si concedía el *injunction* permanente. En

específico, el foro sentenciador dispuso que el Estado debía justificar los cierres conforme a la reglamentación, no solo de las escuelas objeto del interdicto, sino de **todos** los planteles escolares que el Departamento tiene bajo su jurisdicción y que pretendía cerrar.

Así las cosas, el 4 de junio de 2018 los padres demandantes presentaron una *Solicitud de sentencia parcial en torno a reglamentación aplicable al cierre de escuelas*. En su petición, argumentaron que el *Volumen C: Otros Asuntos, Serie C-107* (*Serie C-107*) inmerso en el *Compendio de Políticas del Departamento de Educación* (*Compendio*) no era válido. Sostuvieron su nulidad en que no contenía fecha de aprobación ni firma y tampoco señalaba la base legal que autorizaba su emisión. Así también, indicaron que el *Compendio* publicado el 7 de agosto de 2017 no incluyó el documento *Serie C-107*. Por ello, alegaron que el proceso de cierre, consolidación o restructuración no podía regirse por ese documento, sino por la *Carta Circular 33-2016-2017*. Además, apuntaron que el cierre de los planteles escolares no se podía catalogar como una regla de administración o como un documento guía, ya que incidía sobre derechos, procesos y prácticas que el público tenía disponible. Esto, pues a través de esa reglamentación se hizo efectivo el derecho fundamental de la educación, de estirpe constitucional.

Oportunamente, el Departamento objetó ese petitorio mediante una *Oposición a solicitud de sentencia parcial y*

*enmienda a las alegaciones de la demanda*. En su escrito, aseveró que la solicitud pretendía enmendar las alegaciones ya que era la primera vez que pretendía impugnar la validez del *Compendio*. Sostuvo que el *Compendio*, en particular el documento *Serie C-107*, era un documento administrativo mediante el cual la Secretaria comunicaba a sus funcionarios instrucciones para implementar la política pública del Departamento y que este no afectaba directa o sustancialmente los derechos o los procedimientos disponibles al público general. A esos efectos, el Departamento adujo que, por tratarse de un reglamento interno o documento guía, se encontraba exento de cumplir las formalidades de la Sec. 2.5 de la *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico* (LPAU), Ley Núm. 38-2017, 3 LPRA sec. 9615. Asimismo, expresó que nuestra Constitución reconocía como derecho la enseñanza gratuita primaria y secundaria, hasta donde las facilidades del Estado lo permitan, y que los niños fueron reubicados en planteles escolares que estaban a una distancia prudente de los consolidados. En ese contexto, argumentó que los cierres no lesionan el derecho a la educación porque los estudiantes continuarían recibiendo una educación pública, gratuita y adecuada, y que este no comprendía el derecho a exigir estudiar en una escuela particular.

Por otro lado, el 6 de junio de 2018 el Municipio de Morovis, representado por su Alcaldesa, la Hon. Carmen I. Maldonado González, quien compareció por sí y en representación de varias partes afectadas ⸻ocho

progenitores cuyos hijos estudiaban en planteles que iban a ser cerrados en la municipalidad— presentó una *Demanda*.[3] En su escrito, alegó que el Departamento se propuso cerrar de forma arbitraria, ilegal y caprichosa tres escuelas localizadas en Morovis sin cumplir con el debido proceso de ley. Adujo que esta actuación causó varios daños a las partes comparecientes y a la población moroveña en general, al privarles del derecho constitucional a la educación. Además, aseveró que, mediante sus acciones, el Departamento no estaba cumpliendo con su deber de ofrecer una educación de calidad, gratuita y accesible, encomiendas impuestas por la Constitución y por la ley orgánica del Departamento. El Municipio también afirmó que el cierre de planteles escolares privó a la juventud moroveña de "una educación que le cree un sentido de pertenencia a la comunidad y fortalezca su autoestima", que es uno de los propósitos de la ley orgánica del Departamento. Asimismo, alegó que el Departamento discriminó contra los niños por su origen y condición social porque las escuelas elegidas se caracterizaban por atender a comunidades pobres. Destacó que, en los tres planteles escolares a cerrarse, habían estudiantes que participaban del Programa de Educación Especial.

---

[3] Identificó como partes afectadas a las personas siguientes: la Sra. Aleida Villafañe Pagán, la Sra. Yamilleth Hidalgo Pérez, el Sr. Carlos Cardona Santiago, la Sra. Jackeline Reyes Ginés, la Sra. Aneysha Class, el Sr. Luis Alberto Salgado Camacho, la Sra. Karla Marie Ortiz Meléndez y la Sra. Daisy J. Cruz Alvarado. De otro modo, las concernientes escuelas a ser cerradas son la Segunda Unidad David Colón Vega, Carlos Alverio Pimentel y Manuel Alfonso Díaz.

Según el Municipio, el Departamento no cumplió con lo exigido en su ley orgánica de someter ante el Consejo General de Educación (Consejo) para evaluación cualquier propuesta de eliminar servicios, por lo que sus actuaciones eran *ultra vires*. Además, sostuvo que no se les informó cuáles planteles escolares serán los receptores de los estudiantes moroveños, pero que terceras personas manifestaron que las escuelas receptoras estarán fuera de la municipalidad. Finalmente, planteó que procedía la expedición de un *injunction* preliminar y un *injunction* permanente para forzar al Departamento a mantener los planteles escolares abiertos y así evitar daños irreparables. Específicamente, solicitó una orden para exigir al Departamento cumplir con la ley, mantener las escuelas abiertas y prohibir el traslado de estudiantes a otras escuelas.

Ese mismo día, el Municipio de Morovis también instó una *Moción urgente solicitando se emita injunction preliminar* con el propósito de que se ordenara a los demandados cumplir con la ley. Alegó como daño que a los estudiantes se les privó del desarrollo académico adecuado, así como daños irreparables a la educación, la familia, la salud mental, la economía y el desarrollo socioeconómico de los ciudadanos de Morovis. En su petición, alegó que tenía una alta probabilidad de prevalecer, puesto que el Departamento incumplió con su ley orgánica y la expedición del interdicto era el único remedio disponible para impedir el cierre de las escuelas. Por lo tanto, solicitó la

celebración de una vista de *injunction* preliminar para que el Estado compareciera a mostrar causa por la cual no debía concederse el remedio solicitado.

Así las cosas, el 6 de junio de 2018 el Tribunal de Primera Instancia dictó una *Resolución y orden sobre consolidación e interdicto preliminar*. Estimó que el Municipio de Morovis expuso cuestiones comunes de hechos y de derecho a la causa de acción instada por los padres demandantes. Resolvió que, dado a que las alegaciones de los padres demandantes y el Municipio de Morovis (en conjunto "los recurridos") eran similares, ambas causas debían ser consolidadas. A su vez, emitió una orden de cese y desista sobre el cierre de las tres escuelas sitas en Morovis al apreciar "el mismo daño irreparable que causa la incertidumbre de un proceso plagado de controversias jurídico procesales, que de su faz luce ser arbitrario y caprichoso y que provoca desesperanza en padres, hijos[,] estudiantes y maestros".[4] Reiteró, además, que la vista de *injunction* permanente se llevaría a cabo el 11 de junio de 2018.

Luego de la vista, el foro primario emitió una *Sentencia Declaratoria de Injunction Permanente*. Determinó que el Estado no probó cómo se hizo el proceso de análisis para el cierre de planteles escolares, ni cómo se diseñaron los procesos de deliberación, notificación y reconsideración o revisión administrativa. En su dictamen,

---

[4] *Resolución y orden sobre consolidación e interdicto preliminar*, Apéndice del Escrito de Apelación, pág. 102.

esbozó que el método que el Departamento utilizó para notificar los cierres fue a través de comunicados de prensa, la red social Facebook y ciertos enlaces provistos. Dispuso que en esas comunicaciones no se advirtió sobre el procedimiento para peticionar reconsideración. El foro recurrido indicó que del testimonio de un testigo del Estado se desprendió que no se instauró un parámetro escrito para solicitar reconsideración y que se desconocía si se formuló un mecanismo de revisión administrativa o revisión judicial. Estimó que la controversia estribaba en justipreciar si el proceso establecido por el Departamento para el cierre de escuelas cumplía con el debido proceso de ley al aplicar un escrutinio estricto por afectarse el derecho constitucional a la educación.

Al disponer la controversia, coligió que el Gobierno basó todo su caso en fuentes de Derecho que no delineaban de forma empírica, científica o numérica cuáles planteles escolares se cerrarían y cuáles se mantendrían abiertos. Esbozó su preocupación sobre que el Estado estimara que la notificación en un enlace de una red social podía constituir una notificación administrativa conforme a derecho, sin advertir o establecer ni incluir en la comunicación un proceso de revisión administrativa o judicial claro. Por último, decidió que la reglamentación que regía el proceso de cierre era nula y mantuvo en vigor la orden de cese y desista de cerrar las nueve escuelas objeto de la demanda.

Disconforme, el 25 de junio de 2018 el Estado acudió al Tribunal de Apelaciones.[5] Empero, el 27 de junio de 2018 presentó ante esta Curia una *Urgente petición de auto de certificación intrajurisdiccional* y una *Urgente moción en auxilio de jurisdicción*, para que acogiéramos con premura el asunto y paralizáramos los efectos de la determinación del Tribunal de Primera Instancia.[6] El 29 de junio de 2018 emitimos una resolución mediante la cual expedimos el auto de certificación intrajurisdiccional, mas no dejamos sin

---

[5] Presentó un recurso de apelación en el que planteó los señalamientos de errores siguientes:

> Erró y abusó de su discreción el Honorable Tribunal de Primera Instancia al denegar la moción de desestimación presentada por el Gobierno y al expedir el recurso altamente privilegiado del *Injunction*, a pesar de que en el caso de autos no se cumplen los requisitos necesarios para su expedición de conformidad con la Regla 57.3 de las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. V.

> Erró el Honorable Tribunal de Primera Instancia al entender que la consolidación y cierre de las escuelas constituyó una violación del derecho constitucional a la educación y el debido proceso de ley de los estudiantes, a pesar de que estos pudieron culminar el año escolar 2017-2018 y tienen disponibles escuelas receptoras para continuar sus estudios durante el próximo año escolar 2018-2019.

> Erró el Honorable Tribunal de Primera Instancia al expedir el recurso altamente privilegiado del *Injunction* para impedir que la Secretaria de Educación lleve a cabo una actuación para la cual está facultada por ley, específicamente, por el Artículo 2.04 de la Ley Núm. 85-2018, conocida como la Ley de Reforma Educativa de Puerto Rico.

> Erró el Honorable Tribunal de Primera Instancia al declarar nulo el *Procedimiento y Análisis para Operación, Rendición y Consolidación, por necesidad, de las Escuelas del Sistema Público de Puerto Rico para Finales del Año Académico 2017-2018* establecido en el Compendio de Políticas del Departamento de Educación; al concluir que no se cumplió con el requisito de notificación según dispuesto en la Ley de Procedimiento Administrativo Uniforme.

> Erró el Honorable Tribunal de Primera Instancia al reconocerle legitimación activa al Municipio de Morovis por sí y en representación de los padres de menores, para instar la Petición de *Injunction* Preliminar y Permanente relacionada al cierre de escuelas.

efecto el decreto del foro de instancia. Además, concedimos a los recurridos un término de cinco días para que se expresaran sobre los planteamientos del peticionario.

En primer lugar, esta Curia debió atender el planteamiento del Estado sobre la falta de legitimación activa del Municipio de Morovis.[7]

## II

La doctrina de justiciabilidad establece como principio elemental que los tribunales existen únicamente para resolver controversias genuinas surgidas entre partes opuestas que tienen un interés real de obtener un remedio que haya de afectar sus relaciones jurídicas.[8] A esos efectos, la jurisdicción de los tribunales está regida por la aplicación de ciertos criterios de autolimitación que dan vida a esta doctrina, entre ellos el principio de legitimación activa o el *standing*.[9]

En ausencia de una ley que expresamente confiera legitimación activa, la parte que promueve una acción tendrá acceso al tribunal si satisface los requisitos siguientes: (1) que ha sufrido un daño claro y palpable; (2) que el daño es real, inmediato y preciso, y no abstracto e hipotético; (3) que existe conexión entre el daño sufrido y la causa de acción ejercitada, y (4) que la

---

[7] El Municipio de Morovis no presentó un alegato propio, sino que el 5 de julio de 2018 instó una *Moción uni[é]ndonos a otra en cumplimiento de orden*, a través de la cual se unió por referencia a lo expuesto por los padres demandantes en su *Moción en cumplimiento de resolución del 29 de junio de 2018.*
[8] *E.L.A. v. Aguayo*, 80 DPR 552 (1958).
[9] *P.P.D. v. Gobernador I*, 139 DPR 643 (1995).

causa de acción surge bajo el palio de la Constitución o de una ley.[10]

En términos generales, el principio de legitimación activa consiste en determinar quién puede acudir al tribunal a vindicar sus derechos.[11] A tales efectos, hemos establecido que, como norma general, las partes "tienen capacidad tan solo para plantear sus propios derechos contra actos alegadamente ilegales del gobierno".[12] Si una parte no cuenta con legitimación activa la controversia no es justiciable.[13] Es decir, los tribunales tienen que abstenerse de atenderla y procede su desestimación.

El Gobierno señala como error que el Tribunal de Primera Instancia reconoció legitimación activa al Municipio de Morovis para instar la petición de *injunction* preliminar y permanente por sí y en representación de varios padres de estudiantes. Como parte de su análisis, argumentó que el Municipio de Morovis no ostentaba legitimación activa porque de la evidencia desfilada se desprendía que no estaba expuesto a sufrir un daño. Además, aseveró que sus alegaciones eran genéricas, especulativas y carentes de información real y concreta. En su recurso, planteó que el hecho que se haya invitado a la Alcaldesa de la municipalidad a una reunión general donde se presentó el

---

[10] *Romero Barceló v. E.L.A.*, 169 DPR 460, 470-471 (2006); *Col. Peritos Elec. v. A.E.E.*, 150 DPR 327, 341 (2000); *Asoc. Maestros P.R. v. Srio. Educación*, 137 DPR 528 (1994); *Hernández Torres v. Gobernandor*, 129 DPR 824 (1992); *Hernández Agosto v. Romero Barceló*, 112 DPR 407 (1982).
[11] *Asoc. Fotoperiodistas v. Rivera Schatz*, 180 DPR 920, 942 (2011).
[12] *Íd.*, pág. 943. Véase, además, *C.E.S. U.P.R. v. Gobernador*, 137 DPR 83, 106 (1994); *E.L.A. v. P.R. Tel. Co.*, 114 DPR 394, 396 (1983).
[13] *Íd.*, pág. 932.

proceso de análisis dispuesto en el *Compendio* para el cierre y consolidación de escuelas no le concedía legitimación. En vista de esto, nos solicita que desestimemos la acción incoada por el Municipio de Morovis.

Por su parte, los recurridos sostienen que el error señalado no se cometió. Explicaron que, en consideración de lo resuelto en *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 US 701 (2007), el foro primario determinó que el Municipio de Morovis tenía legitimación activa en vista de que debió ser parte integral del proceso de recomendación del cierre de los planteles escolares.

En *Parents Involved in Community Schools*, *supra*, un grupo de padres demandó al distrito escolar de Seattle, al amparo del derecho a la igual protección de las leyes, para impugnar un plan de admisión de estudiantes que consideraba la raza como factor para acomodar estudiantes en escuelas con sobrecupo. A pesar de que el distrito argumentó que el daño que pudieran sufrir los estudiantes era especulativo, el Tribunal Supremo federal resolvió que los padres de estos tenían legitimación activa. Es evidente que este caso no favorece la postura del Municipio de Morovis, pues aquí no está en controversia si los padres a quienes la municipalidad pretende representar tienen legitimidad activa o no. La interrogante es si el Municipio tiene legitimación por sí o en representación de esos padres. A la luz de los antecedentes fácticos y el estado de derecho, era forzoso resolver que no la tiene.

Luego de examinar con rigor la prueba ante nuestra consideración, debimos concluir que el Municipio de Morovis no logró establecer cuál es su interés legítimo en este caso. Observamos que en la vista celebrada el 11 de junio de 2018, su alcaldesa reconoció que acudió a los tribunales porque muchos de los padres afectados no contaban con los recursos para hacer valer sus derechos. De la vista también surgió que el Municipio daba mantenimiento a todas las escuelas de Morovis, y que con algunas tenía un contrato de mantenimiento. Ninguna de esas condiciones nos convence de que el Municipio tenga un interés "de tal índole que, con toda probabilidad, habrá de proseguir su causa de acción vigorosamente y habrá de traer a la atención del tribunal las cuestiones en controversia".[14]

Si bien hemos resuelto que una agrupación que no ha sufrido daños propios puede acudir al foro judicial a nombre de sus miembros, ello no subsana el defecto en la legitimación del Municipio.[15] En este caso no hay un ápice de prueba que demuestre que es una entidad que representa a los padres de estudiantes. Reiteramos que todo demandante tiene que demostrar que posee, no solamente la capacidad para demandar, sino además un interés legítimo en el caso.[16] Según hemos pautado, en el caso de que se pretenda reclamar los derechos constitucionales de terceros, los criterios para evaluar el interés de la parte litigante son más

---

[14] *Asoc. de Periodistas v. Rivera Schatz*, *supra*, pág. 942.
[15] *Col. Ópticos de P.R. v. Vani Visual Center*, *supra*.
[16] *Íd.*, pág. 564.

rigurosos.[17] El Municipio no cumplió con ellos. En consecuencia, tal y como adelantamos, procedía la desestimación de la demanda presentada por el Municipio de Morovis ante su evidente falta de legitimación activa.

Así las cosas, nos compete entonces atender las reclamaciones relacionadas con los padres demandantes.

**III**

**A. *Injunction* permanente**

El *injunction* es un mandamiento judicial expedido por escrito, bajo el sello de un tribunal, mediante el cual se requiere a una persona que se abstenga de hacer, o de permitir que haga por medio de otras bajo su intervención, determinada cosa que infrinja o perjudique el derecho de otra.[18] Este recurso extraordinario "se caracteriza por su perentoriedad, por su acción dirigida a evitar un daño inminente o a restablecer el régimen de ley conculcado por conducta opresiva, ilegal o violenta del transgresor del orden jurídico".[19] Se trata de un remedio judicial que prohíbe u ordena la ejecución de determinado acto, con el fin de evitar que se causen perjuicios inminentes o daños irreparables a alguna persona, en casos en los que no hay otro remedio adecuado en ley.[20]

---

[17] *Íd.*, pág. 565. Estos criterios son los siguientes: (1) que el miembro tenga legitimación activa para demandar a nombre propio; (2) los intereses que se pretendan proteger estén relacionados con los objetivos de la colectividad, y (3) la reclamación y el remedio solicitado no requieran la participación individual de cada miembro. *Muns. Aguada y Aguadilla v. JCA*, 190 DPR 122, 133 (2014).

[18] Art. 675 del Código de Enjuiciamiento Civil, 32 LPRA sec. 3521.

[19] *Plaza Las Américas v. N & H,* 166 DPR 631, 643 (2005); *Peña v. Federación de Esgrima de P.R.,* 108 DPR 147, 153-154 (1978).

[20] *VDE Corporation v. F&R Contractors*, 180 DPR 21, 40 (2010); *E.L.A. v. Asoc. de Auditores*, 147 DPR 669, 679 (1999).

El Art. 677 del Código de Enjuiciamiento Civil, 32 LPRA sec. 3523, dispone las instancias en las que puede concederse un *injunction*. Entre ellas se señalan las siguientes:

> (1) Cuando resultare de la petición que el peticionario tiene derecho al remedio solicitado, y dicho remedio, o parte del mismo, consistiere en impedir la comisión o continuación del acto denunciado, bien por un periodo de tiempo limitado, o perpetuamente.

> (2) Cuando de la petición o de la declaración jurada resultare que la comisión o continuación de algún acto, durante el litigio, habrá de causar pérdidas o daños de consideración o irreparables a alguna de las partes.

> (3) Cuando, durante el litigio, resultare que una de las partes está cometiendo, o amenaza cometer, o que se dispone a cometer, o a procurar o permitir que se cometa, algún acto de contrario a los derechos de otra de las partes, con respecto al asunto en litigio y tendente a hacer que sea ineficaz la sentencia.

> (4) Cuando una compensación pecuniaria no habría de proporcionar adecuado remedio.

El tribunal podrá dictar una orden de entredicho provisional, *injunction* preliminar o permanente siempre y cuando se cumplan los términos de la Regla 57 de Procedimiento Civil, 32 LPRA Ap. V, a saber:

> (a) [e]n aquellos casos en que ello sea indispensable para hacer efectiva su jurisdicción y previa una determinación de que la orden es indispensable para evitar un daño irreparable a la parte peticionaria.

> (b) [c]uando en la petición se alegue que alguna persona, bajo la autoridad de alguna ley, ordenanza, o reglamento del Estado Libre Asociado de Puerto Rico, esté privando o sea el causante de que alguien esté

privando al peticionario de algún derecho, privilegio o inmunidad protegido por la Constitución o las leyes del Estado Libre Asociado de Puerto Rico o por la Constitución o leyes de los Estados Unidos de América que sean aplicables a las personas bajo la jurisdicción del Estado Libre Asociado de Puerto Rico.

Asimismo, el Art. 678 del Código de Enjuiciamiento Civil, 32 LPRA sec. 3524, prescribe determinadas circunstancias en las que los foros judiciales no pueden conceder un *injunction*. Esto se dispone para sostener la uniformidad y la organización del proceso de gobierno e impedir la multiplicidad de opiniones sobre la constitucionalidad de las leyes.[21] El precepto angular del estatuto "es la presunción de constitucionalidad de las leyes, hasta tanto sean declaradas nulas por sentencia final, firme, inapelable e irrevisable".[22] En lo material, el aludido estatuto prohíbe la otorgación del *injunction*

> [p]ara impedir la aplicación u observancia de cualquier ley de la Asamblea Legislativa de Puerto Rico, **o el cumplimiento de cualquier actuación autorizada por ley de la Asamblea Legislativa de Puerto Rico, de un funcionario público, de una corporación pública, o de una agencia pública, o de cualquier empleado o funcionario de dicha corporación o agencia,** a menos que se hubiera determinado por sentencia final, firme, inapelable e irrevisable que dicha ley o actuación autorizada por ley es inconstitucional o inválida. (Énfasis suplido).[23]

La referida disposición establece que "[c]ualquier *injunction* preliminar, permanente, o con carácter de entredicho provisional, incluso cualquier orden para hacer

---

[21] Exposición de Motivos de la Ley Núm. 1 de 25 de febrero de 1946, Leyes de Puerto Rico 3.
[22] *Asoc. Maestros de P.R. v. Torres*, 136 DPR 742, 748 (1994).
[23] Art. 678 del Código de Enjuiciamiento Civil, 32 LPRA sec. 3524.

efectiva la jurisdicción de un tribunal o para asegurar la efectividad de una sentencia, que se haya expedido en las circunstancias expuestas en [el referido] inciso … y que esté en vigor a la fecha de vigencia de esta ley o que en lo sucesivo se expidiere, será nulo e inefectivo". [24]

Sin embargo, y a manera de excepción, esta también dispone que los tribunales pueden emitir un *injunction*

> [c]uando en la petición se alegue que alguna persona, bajo la autoridad de alguna ley, ordenanza, o reglamento del Estado Libre Asociado de Puerto Rico, esté privando o sea el causante de que alguien esté privando al peticionario de algún derecho, privilegio o inmunidad protegido por la Constitución o las leyes del Estado Libre Asociado de Puerto Rico o por la Constitución o leyes de los Estados Unidos de América que sean aplicables a las personas bajo la jurisdicción del Estado Libre Asociado de Puerto Rico.
>
> Disponiéndose, además, que al dictar dicha orden el tribunal debe considerar el interés público envuelto y concluir que la parte peticionaria tiene una posibilidad real de prevalecer en los méritos de su petición.[25]

En estas circunstancias, los foros judiciales no pueden restringir la obligación que tienen los funcionarios públicos de cumplir la ley, a menos que se demuestre que a todas luces es inconstitucional.[26] Al respecto, en *Las Monjas Racing Corp. v. Com. Hípica*, 67 DPR 45 (1947), al interpretar el Art. 678 del Código de Enjuiciamiento Civil, señalamos que antes de expedir un *injunction* lo primero a determinar es si la actuación de la agencia era una autorizada en ley. El criterio rector es si el acto está

---

[24] *Íd.*
[25] *Íd.*
[26] *Brenes v. Domenech, Tesorero*, 48 DPR 565, 569 (1935).

comprendido dentro de la autoridad conferida en ley al funcionario gubernamental o de una corporación o agencia pública, y no si tal acción era válida o constitucional.

El Gobierno sostiene que nuestro ordenamiento prohíbe la concesión de un *injunction* para impedir que un funcionario público realice un acto que la ley autorizó, a falta de una determinación por sentencia final donde se decrete que el estatuto o el acto permitido por ley es inconstitucional o inválido. Alega que, puesto a que no se ha declarado inconstitucional, el Art. 2.04 de la Ley 85 confiere a la Secretaria la facultad de establecer y regular el cierre, apertura, consolidación y reorganización de las instalaciones donde operan las escuelas de la Isla. Cónsono con ello, expresó que los padres demandantes no demostraron que la Ley 85 no autorizaba el proceder de la Secretaria.

En cambio, los padres demandantes aducen que el *injunction* está disponible si un funcionario del Estado, bajo el pretexto de cumplir la ley, quebranta los derechos reconocidos de las personas. Sostienen que el Estado vulneró sus derechos constitucionales al actuar de forma arbitraria y caprichosa y al no ejecutar un proceso justo, equitativo y razonable antes de ordenar que los planteles escolares fueran cerrados. Exponen que la violación a sus derechos constitucionales les provocó un daño irreparable que solo puede ser subsanado con la expedición del *injunction*.

En esencia, la argumentación de los padres demandantes gira en que el *injunction* se puede conferir porque, al infringirse el derecho a la educación de sus hijos, se quebrantó el derecho constitucional a un debido proceso de ley procesal y a la igual protección de las leyes.

En vista de estos planteamientos, es imperativo justipreciar si, en efecto, el Estado transgredió esas garantías constitucionales.

### i. Debido proceso de ley

De entrada, hay que diferenciar entre los derechos estatutarios procesales y el debido proceso de ley.[27] Hay ciertos derechos que emanan de disposiciones legales, mientras que otros se originan de la garantía constitucional del debido procedimiento de ley.[28]

Enunciado lo anterior, y en lo atinente, la Enmienda Decimocuarta de la Constitución federal garantiza que "[n]ingún estado privará a persona alguna de su vida, de su libertad o de su propiedad, sin el debido procedimiento de ley".[29] Asimismo, nuestra Constitución preceptúa que "[n]inguna persona será privada de su libertad o propiedad sin debido proceso de ley".[30]

Conforme hemos reconocido, el debido proceso de ley, como derecho fundamental, tiene dos vertientes: la

---

[27] D. Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, 3ra ed., Bogotá, Ed. Forum, 2013, pág. 394.
[28] *Íd.*, pág. 394.
[29] Emda. XIV, Const. EE. UU., LPRA, Tomo 1, ed. 2008, pág. 206.
[30] Art. II, Sec. 7, Const. PR, Tomo I, ed. 2008, pág. 296.

sustantiva y la procesal.[31] En su aspecto sustantivo "persigue proteger y salvaguardar los derechos fundamentales de la persona".[32] Este "representa una barrera para acciones estatales que sean arbitrarias o caprichosas que afecten derechos fundamentales de los ciudadanos".[33] La modalidad procesal, "impone al Estado la obligación de garantizar que la interferencia con los intereses de libertad y propiedad del individuo se haga a través de un proceso que sea justo y equitativo".[34] Esta última se activa si se demuestra que está en juego un *interés individual* de libertad o de propiedad.[35] Así, para ver si la exigencia del debido proceso de ley aplica, en primer lugar se debe indagar la *naturaleza del interés involucrado*, y no su peso.[36]

Décadas atrás el Tribunal Supremo federal reconoció que un interés libertario, en general, no se limita a una restricción física del individuo, sino que comprende, entre otras cosas, el derecho de adquirir conocimiento.[37] Sin embargo, es indispensable que esté en juego un *interés individual*. La distinción entre las privaciones individualizadas y las privaciones *policy-based* de los

---

[31] *Rivera Rodríguez v. Lee Stowell*, 133 DPR 881, 887 (1993).

[32] *Rodríguez Rodríguez v. E.L.A.*, 130 DPR 562, 576 (1992).

[33] *Aut. Puertos v. H.E.O.*, 186 DPR 417, 428 (2012).

[34] *Rivera Rodríguez v. Lee Stowell*, *supra*, pág. 888.

[35] *Fuentes Bonilla v. Estado Libre Asociado de Puerto Rico*, 2018 TSPR 98, en la pág. 34, 200 DPR ___ (2018); *Marcano v. Departamento de Estado*, 163 DPR 778, 791 (2005). Véase, además, Fernández Quiñones, *op. cit.*, pág. 403.

[36] *Board of Regents v. Roth*, 408 US 564, 570-571 (1972).

[37] *Íd.*, pág. 572; *Meyer v. Nebraska*, 262 US 390 (1923). Véase, además, J. J. Álvarez González, *Derecho Constitucional de Puerto Rico*, Bogotá, Ed. Temis, 2010, pág. 608, que enmarca el *interés libertario* de un estudiante conforme lo resuelto en *Pagán Hernández v. U.P.R.*, 107 DPR 720 (1978).

intereses de una clase es medular para entender el sistema legal de Estados Unidos. [38] Las primeras están protegidas por el debido proceso de ley, las segundas no lo están.[39] Dado a su pertinencia para el tema, conviene considerar la normativa que pautó el Tribunal Supremo de Estados Unidos *en Bi-Metallic Investment Co. v. State Bd. of Equalization of Colo.*, 239 US 441, 445 (1915), al disponer lo que sigue:

> Where a rule of conduct applies to more than a few people it is impracticable that every one should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule. If the result in this case had been reached as it might have been by the State's doubling the rate of taxation, no one would suggest that the Fourteenth Amendment was violated unless every person affected has been allowed an opportunity to raise his voice against it before the body entrusted by the state constitution with the power.

Desde entonces, comenzó la distinción entre hechos legislativos y hechos adjudicativos. Los hechos legislativos son hechos generales que ayudan a las instituciones gubernamentales a decidir interrogantes de ley, política pública y discrecionales. Es decir, no se

---

[38] R. J. Pierce Jr., *Administrative Law Treatise*, 5ta ed., Aspens Publishers, 2010, Tomo II, pág. 737. ("The distinction between individualized deprivations, that are protected by the procedural due process, and policy-based deprivations of the interests of a class, that are not protected by procedural due process, is central to an understanding of the U.S. legal system.")
[39] *Íd.*

considera individualmente el efecto por la acción gubernamental o la conducta pasada del individuo.[40]

En síntesis, hay determinaciones de política pública que se pueden tomar sin participación pública alguna. No obstante, si

> el Estado vuelca su poder sobre un individuo o un grupo de individuos y al así hacerlo **considera su situación particular, y solamente la de éste o éstos, afectando sus intereses propietarios o libertarios entonces, en esos casos, la Constitución se interpone entre la persona y el Estado para asegurar que haya un proceso que ayude a filtrar el trato arbitrario.** La lógica política lo explica: cuando el Estado actúa como soberano sobre el Pueblo, éste tiene a su disposición canales políticos dispuestos en la Constitución para evitar determinaciones arbitrarias, pero cuando actúa con relación a pocas personas sobre circunstancias aplicables a sólo éstas, el cauce político puede que no sea muy efectivo por encontrarse el individuo solo frente al Estado. (Énfasis suplido).[41]

Es por ello que, como regla general, se estima lo siguiente: "[a]n individual has a constitutional right to be heard only with respect to resolution of a disputed fact of the first type –a fact concerning the individual. Court refer to facts of this type as adjudicative facts".[42]

Una vez la persona acredita que un interés individual suyo se encuentra en juego, sea libertario o propietario, entonces "procede que definamos cuál es el proceso exigido

---

[40] Pierce Jr., *op. cit.*, pág. 742. ("Legislative facts do not describe the individual who is uniquely affected by the government action or that individual's past conduct. Rather, legislative facts are the general facts that help a government institution decide questions of law, policy, and discretion".)

[41] H. A. Meléndez Juarbe, *Derecho Constitucional*, 75 Rev. Jur. U.P.R. 29, 38 (2006).

[42] Pierce Jr., *op. cit.*, pág. 741.

(*what process is due*)". (Énfasis en el original).[43] El tipo de proceso que se debe observar dependerá de las circunstancias, pero siempre es imprescindible que el proceso gubernamental sea justo e imparcial.[44]

Sobre este asunto, el Estado planteó que no lo infringió porque no afectó un interés libertario o propietario, toda vez que los recurridos no tenían un interés o derecho propietario a estudiar en un plantel escolar en particular. Indicó que en el proceso de cierre, consolidación o reorganización de escuelas no tenía que cumplir con el Art. 8.01(f) de la Ley 85, pues la disposición no aplica al haberse consignado en la propia disposición que entraría en vigor a partir del 1 de julio de 2018. Además, adujo que los cierres concernientes tampoco se regían por la Carta Circular 33-2016-2017, sino por el *Compendio*, el cual era válido al no incidir directa ni sustancialmente sobre los procesos o prácticas disponibles para el público. Sostuvo que eran instrucciones, declaraciones interpretativas y de política general, y por ende, exentas de cumplir un proceso de reglamentación. En ese sentido, expresó que de la prueba que desfiló ante el tribunal de instancia emanaba el cumplimiento del proceso dispuesto en el *Compendio* para el cierre y consolidación de escuelas. Señaló que no tenía que notificar los cierres o consolidación porque el *Compendio* no lo exigía y que esa decisión no fue hecha como parte de

---

[43] *Fuentes Bonilla v. Estado Libre Asociado de Puerto Rico*, *supra*, pág. 35.

[44] *Rodríguez Rodríguez v. E.L.A.*, *supra*, pág. 578.

un proceso adjudicativo formal, ni se determinó o adjudicó derechos, obligaciones o privilegios de los recurridos, sino que fue un ejercicio válido de planificación administrativa dirigido a maximizar los recursos disponibles y a asegurar el buen uso de la propiedad pública.

Por su parte, los padres demandantes manifestaron que el derecho constitucional a la educación se tiene que materializar mediante reglamentación adecuada, fundamentada y razonable que ofrezca garantías mínimas en sus procesos. Aludieron que el cierre de los planteles escolares tiene que cumplir con un proceso justo, equitativo y razonable, lo cual no ocurrió. Por ende, argumentan que el Estado violó su derecho del debido proceso de ley y la igual protección de las leyes. Además, adujeron que pese a que se ordenó el Estado no presentó prueba documental sobre el proceso practicado para cerrar las escuelas. Sostuvieron que la representante de la Secretaria admitió que el documento utilizado para ello fue el *Serie C-107*, el cual el Tribunal de Primera Instancia declaró nulo por carecer de fecha de aprobación, de firma y base legal. Argumentaron que el cierre de planteles escolares no era una regla de administración, ni un documento guía, porque infringía derechos, procesos y prácticas disponibles para el público general, según la LPAU. Indicaron que la testigo del Gobierno corroboró que, antes de decretar el cierre, los padres o miembros de la comunidad no fueron notificados y

que no se creó un proceso de revisión administrativa o judicial de esa determinación.

En cuanto a este asunto, es menester aclarar que, desde un principio, los padres demandantes admitieron que la Ley 85 concede a la Secretaria la facultad para decretar los cierres de las escuelas. Sus planteamientos nunca estuvieron dirigidos a cuestionar los poderes delegados. Mas bien, lo que impugnan es el procedimiento que utilizó y la forma en que el Departamento ejecutó tales poderes en el cumplimiento de sus responsabilidades.

La Ley 85 delega a la Secretaria un sinnúmero de responsabilidades y poderes para que administre el Sistema de Educación Pública de forma eficiente y efectiva, según la política pública promulgada, de suerte que pueda cumplir los propósitos de la Constitución y de la ley.[45] Conforme a las responsabilidades de su cargo, esta tiene la obligación de administrar la organización, planificación, monitoreo y evaluación financiera, así como las actividades académicas y administrativas del Departamento y del Sistema de Educación Pública.[46] Precisamente, una de las encomiendas más importantes consiste en velar porque el Sistema de Educación Pública sea sustentable, de manera que los hijos de las futuras generaciones cuenten con los recursos indispensables para recibir una educación de altura.[47] Para lograr ese cometido, cuenta con la facultad para desarrollar la estrategia y manejo de las instalaciones

---

[45] Art. 2.04. de la Ley 85-2018.
[46] *Íd.*, Art. 2.04b(1).
[47] *Íd.*, Art. 2.04b(7)y(4).

escolares y establecer y regular la apertura, cierre, consolidación o reorganización de estas, previa determinación de necesidad.[48]

Sobre esta última, el Art. 8.01(f) de la Ley 85 erige unos criterios que la Secretaria deberá utilizar previo al cierre, consolidación y reorganización de cualquier escuela, **a partir del 1 de julio de 2018.** La disposición establece que la Secretaria deberá preparar un estudio que cuente con "indicadores de medición que permitan la valorización por cada criterio". Nótese que la aludida disposición preceptúa expresamente el 1 de julio de 2018 como la fecha de efectividad para cumplir con el estudio que reclaman los padres demandantes, no antes. [49]

Precisamente, en virtud de los poderes amplios que la Asamblea Legislativa delegó a la Secretaria, **previo a esa fecha**, esta publicó en la página del Departamento un listado de más de doscientas escuelas que iban a ser cerradas, entre las cuales se encuentran las seis planteles objeto de este caso.

En cuanto al argumento sobre la violación del debido proceso de ley, es preciso puntualizar que si bien reconocemos que el derecho a la educación es un interés libertario protegido por la Constitución, para que se active el debido proceso de ley procesal es necesario que la actuación gubernamental incida individualmente con ese

---

[48] *Íd.*, Art. 2.04b(14) y (15).
[49] Luego de examinar el historial legislativo, no encontramos indicio alguno que de que la intención de la Asamblea Legislativa fuera que se hiciera extensivo estos requisitos previo al 1 de julio de 2018.

derecho.[50] Esa actuación no debe ser generalizada, sino que debe afectar a las personas en circunstancias aplicables solo a ellas. Solo de esta forma se requiere entonces que el Estado, al actuar, tome en consideración la *situación particular* de ese sujeto y provea un debido proceso de ley. Al ejecutar su discreción y cerrar planteles escolares, la Secretaria lo hizo apoyada en unos criterios generales. En ningún momento los padres demandantes alegaron, ni evidenciaron, que su proceder fue en consideración a una situación particular de ellos. La decisión de la Secretaria sobre el cierre de las escuelas respondió mas bien a una decisión de política pública de maximizar los recursos del Departamento a la luz de la Ley 85. El Estado acreditó, y así lo aceptaron los padres demandantes, que la Secretaria al tomar su decisión discrecional consideró los criterios del *Compendio*, a saber: (1) los informes estatales y federales; (2) la matrícula actual de las escuelas y de los últimos tres años; (3) la infraestructura de los planteles escolares; (4) el aprovechamiento académico de las escuelas en los últimos años; (5) los indicadores de aprovechamiento académico; (6) la oferta académica; y (7) la transportación escolar. Entendemos que la actuación de la Asamblea Legislativa y de la Secretaria quedó comprendida en la normativa jurisprudencial de *Bi-Metallic Investment Co. v. State Bd. Of Equalization of Colo.*, *supra*. Se trata de una actuación *policy-based* en el ejercicio del poder de razón de estado que aplica a un gran número de personas. Por

---

[50] *Board of Regents v. Roth*, *supra*, págs. 570-571.

tanto, el Estado no tenía que conceder un debido proceso de ley a cada uno de los padres y el proceso seguido era suficiente.

En armonía con el marco jurídico que hemos examinado, concluimos que, en el caso de marras, el debido proceso de ley procesal no se activó. Procede ahora analizar si se quebrantó el derecho de la igual protección de las leyes.

### ii. Igual protección de las leyes

La Decimocuarta Enmienda de la Constitución federal garantiza la igual protección de las leyes.[51] De igual forma, la Sec. 7 de nuestra Carta de Derechos establece que no se negará a persona alguna en Puerto Rico la igual protección de las leyes. Por otro lado, la Sec. 1 veda que se establezca discrimen por razón de raza, color, sexo, nacimiento, origen o condición social e ideas políticas o religiosas.[52] De forma reiterada, hemos afirmado que este precepto constitucional no requiere un trato igual para todas las personas, sino que veda el trato desigual injustificado.[53] Por esa razón, "[e]l Estado puede hacer clasificaciones entre las personas sin infringir dicho principio siempre y cuando la clasificación sea razonable y con miras a la consecución o protección de un interés público legítimo".[54] En otros términos, el aludido principio lo que "hace es prohibir que el trato desigual sea

---

[51] Emda. XIV, Const. EE. UU., LPRA, Tomo 1, ed. 2008, pág. 206.
[52] Art. II, Sec. 1, Const. PR, Tomo I, ed. 2008, pág. 272.
[53] *Zachry International v. Tribunal Superior*, 104 DPR 267, 276-277 (1975).
[54] *Íd.*, pág. 277.

injustificado o que la clasificación sea irrazonable".[55] De manera que "no se puede aprobar una ley o norma, o poner en vigor una práctica, que establezca un trato desigual para algunos ciudadanos a menos que exista una razón justificada para ello".[56]

Ante un planteamiento de violación a la igual protección de las leyes se tiene que examinar la razonabilidad de la clasificación. Ello se hace a la luz de dos escrutinios: el estricto o el racional.[57] El escrutinio estricto se emplea cuando se establece una clasificación sospechosa o se infringen derechos fundamentales.[58] En ese último escenario, es menester que la clasificación interfiera **directa y sustancialmente** con un derecho fundamental.[59] De no estar presente ninguna de las situaciones mencionadas, se activa el escrutinio racional cuando se establecen clasificaciones sociales o económicas, en cuyo caso solo exige que la clasificación no sea arbitraria y que tenga un nexo racional con los propósitos del estatuto.[60] Bajo este escrutinio, la actuación o ley se

---

[55] *Rodríguez Rodríguez v. E.L.A.*, *supra*, pág. 581.
[56] *Rodríguez v. Depto. Servicios Sociales*, 132 DPR 617, 634 (1993).
[57] *Rodríguez Rodríguez v. E.L.A.*, *supra*, pág. 581.
[58] *Rodríguez v. Depto. Servicios Sociales, supra*, pág. 635; *Zachry International v. Tribunal Superior*, *supra*, pág. 277, *Rodríguez Rodríguez v. E.L.A.*, *supra*, pág. 581.
[59] *Lyng v. Castillo*, 477 US 635, 638 (1986) ("Nor does the statutory classification 'directly and substantially' interfere with family living arrangements and thereby burden a fundamental right".); *Zablocki v. Redhail*, 434 US 374, 388 (1978) ("When a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests".)
[60] *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 DPR 64, 82 (1983).

presume constitucional y corresponde el peso de la prueba a quien sostenga lo contrario.[61]

Con este marco jurídico en mente, puntualizamos que los padres demandantes no argumentaron la existencia de alguna clasificación sospechosa. Por el contrario, aseveraron que se utilizaron los criterios del *Compendio*, los cuales no se encuentran en ninguna clasificación establecida por nuestra Constitución. Su fundamento es que se transgredió el derecho a la igual protección de las leyes por haberse infringido el derecho a la educación. Por esa razón, nuestro análisis debe ir dirigido a discutir este último planteamiento.

### a. Derecho fundamental a la educación

En múltiples ocasiones hemos reconocido que el derecho a la educación ocupa un sitial prominente en Puerto Rico al estar reconocido como uno de rango constitucional.[62] Su trascendencia es tal "que los miembros de la Asamblea Constituyente incluyeron 'el afán por la educación' como uno de los factores determinantes en nuestra vida como pueblo democrático".[63]

---

[61] *Rodríguez v. Depto. Servicios Sociales, supra*, pág. 634.

[62] *AMPR v. Srio. Educación, E.L.A.*, 178 DPR 253, 270 (2010), *Declet Ríos v. Dpto. de Educación*, 177 DPR 765, 773 (2009), *Pagán Hernández v. UPR*, 107 DPR 720, 738 (1978).

[63] *AMPR v. Srio. Educación, E.L.A., supra*, pág. 270. De hecho, en la Constituyente se expresó que "[e]l fomento de la educación es objetivo básico de toda sociedad democrática, ya que la mejor defensa del sistema democrático de vida lo es una opinión pública bien informada y consciente". 2 Diario de Sesiones de la Convención Constituyente 1123, Ed. 1961 (1952).

Más aún, nuestra Carta Magna reconoce que "[t]oda persona tiene derecho a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales".[64] La introducción de ese texto tuvo dos fines: (1) plasmar el propósito que persigue la educación; y (2) definir la clase de educación que nuestros constituyentes aspiraban que los niños puertorriqueños recibieran.[65]

De otro modo, hemos pronunciado y hoy lo reafirmamos que el Estado tiene un interés apremiante en que la educación, pública o privada, sea una de excelencia. Esto se debe a que imparte la preparación adecuada para que los ciudadanos sean partícipes del desarrollo económico y social de Puerto Rico.[66] A raíz de la envergadura del derecho de educación, nuestra Constitución garantiza que "[h]abrá un sistema de educación pública el cual será libre y enteramente no sectario. La enseñanza será gratuita en la escuela primaria y secundaria y, hasta donde las facilidades del Estado lo permitan, se hará obligatoria para la escuela primaria".[67]

Al abordar el tema sobre la responsabilidad del Estado de proveer educación gratuita y examinar su alcance, resulta imprescindible estudiar lo que aconteció en la

---

[64] Art. II, Sec. 5, Const. PR, LPRA, Tomo I, ed. 2008, pág. 292.
[65] 2 Diario de Sesiones de la Convención Constituyente 1456, Ed. 1961 (1952).
[66] *AMPR v. Srio. Educación, E.L.A.*, *supra*, pág. 271.
[67] Art. II, Sec. 5, Const. PR, LPRA, Tomo I, ed. 2008, pág. 292.

Convención Constituyente. Al comienzo de la Sesión, el texto propuesto para la Sec. 5 de nuestra Carta de Derechos leía como sigue:

> Habrá un sistema de instrucción pública la cual será libre y enteramente no sectario. La enseñanza será gratuita en la escuela elemental y secundaria. No se utilizará propiedad ni fondos públicos para la enseñanza en otras escuelas o instituciones educativas que no sean las del Estado. Nada de lo contenido en esta disposición impedirá que el Estado pueda prestar a cualquier niño servicios no educativos establecidos por ley para protección o bienestar de la niñez.[68]

Empero, durante la discusión de la medida, uno de los delegados, el señor Brunet, propuso una segunda enmienda que posibilitaba que se pudiera reclamar al Estado que proveyera educación. Sugirió que, luego de la fase "la enseñanza será gratuita en la escuela elemental y secundaria", se incorporara "[y] será además obligatoria en la escuela elemental".[69] Tras esta recomendación, se suscitó un debate extenso cuyo enfoque fue la capacidad del Gobierno de sufragar el costo del sostenimiento de las escuelas, que concluyó con la derrota de la mencionada enmienda.[70]

Subsiguientemente, otro delegado, el señor Mellado, sugirió que se añadiera: "será además compulsoria en la escuela elemental hasta donde las facilidades del Estado lo permitan".[71] Explicó que

---

[68] 2 Diario de Sesiones de la Convención Constituyente 1455, Ed. 1961 (1952).
[69] 2 Diario de Sesiones de la Convención Constituyente 1456, Ed. 1961 (1952).
[70] *Íd.*, pág. 1462.
[71] *Íd.*

a mi juicio la argumentación del compañero Brunet y de la argumentación del compañero Benítez se desprende que **todos aceptamos en esta Convención la necesidad de hacer obligatoria la enseñanza primaria, siempre y cuando que el Estado tenga facilidades para ofrecerla.** Yo creo que en cuanto a eso no hay discusión, todos estamos de acuerdo que los niños de Puerto Rico deben asistir compulsoriamente a la escuela primaria que consiste del primero al sexto grado y que esa escuela debe ofrecerse a esos niños hasta donde las facilidades del Estado lo permitan.

Aquí el único argumento que ha expuesto el compañero Benítez, para rebatir la moción del compañero Brunet es que costaría creo que 15 millones de dólares como costo inicial y además 7 millones como gasto de operación anualmente, el sostenimiento de escuelas para admitir a 60 ó 70 mil niños de edad escolar, para escuelas primarias que están afuera de las aulas.

Pues si ése es el único argumento, **mi enmienda hace posible la obligatoriedad de la escuela primaria, sin necesidad de comprometer al Estado, porque le da la oportunidad de ir aumentando gradualmente el número de escuelas primarias y al mismo tiempo hace compulsoria la asistencia y lo hace constitucionalmente, de los niños a la escuela primaria.** (Énfasis suplido).[72]

Luego de esta exposición se le increpó que si la obligatoriedad que proponía la enmienda, en cuanto a que se haga efectiva constitucionalmente es la del niño ir a la escuela, qué tenía que ver el Estado con tener o no tener los medios para que el niño vaya a la escuela, si el que estaba obligado era el niño.[73] El señor Mellado replicó que se hacía "**una especie de declaración de propósitos del Estado de abrir más y más escuelas primarias para atender esa obligación de los padres según sus recursos fiscales se**

---

[72] *Íd.,* pág. 1463.

[73] *Íd.*, pág. 1475 ("¿Si la obligatoriedad que propone su Señoría [que] se haga efectiva constitucionalmente, es la del niño ir a la escuela, que tiene que ver el Estado con tener o no tener lo medios para que el niño vaya a la escuela; si el que está obligado es el niño?").

**lo permit[íeran]**". (Énfasis suplido).[74] Ulteriormente, esta enmienda fue avalada por los constituyentes y se hizo formar parte de nuestro cuerpo constitucional.

Según observamos, un análisis del debate de la Asamblea Constituyente refleja que los delegados aspiraban a que se abrieran un gran número de escuelas, pero a la misma vez tenían la preocupación de que el Estado, eventualmente, no pudiera tener la capacidad para sufragarlas. Es por ello que se llegó al compromiso de ofrecer una educación obligatoria hasta donde sus recursos lo permitieran. Consecuentemente, se instituyó que, en la medida de que el Gobierno cuente con los medios para proveer servicios educativos, este será responsable de prestarlos y podrá exigírsele que así lo haga.

En ese contexto, el Estado arguyó que no privó a los alumnos de su derecho a la educación, ni les ocasionó un daño irreparable, ya que no cesará de prestar los servicios, sino que por razones apremiantes los trasladará a otros planteles escolares sitos en el municipio donde están los que se van a cerrar o consolidar y que allí los estudiantes podrán continuar sus estudios. Señaló que, como la Constitución garantiza el derecho a la educación gratuita en la escuela primaria y secundaria "hasta donde las facilidades del Estado lo permitan", debido a la crisis económica que enfrenta Puerto Rico, el interés público de procurar un efectivo uso de los recursos del Departamento

---

[74] *Íd.*, pág. 1476.

tenía que prevalecer sobre el interés particular de los recurridos de elegir una escuela en particular. Arguyó que el impedir los cierres agudizaría la situación fiscal del Departamento y trastocaría el plan de acondicionamiento de los planteles escolares receptores.

Por su parte, los padres demandantes plantearon que, al infringir el derecho a la educación, se les violó su derecho a la igual protección de las leyes. Sostuvieron que el foro primario dio credibilidad a los catorce testigos que declararon que, previo al cierre, el Departamento no les dio participación a los miembros de las comunidades ni tampoco se les indicó las escuelas que contemplaban cerrar y que se enteraron de sus cierres por medios electrónicos. Asimismo, aseveraron que ese tribunal creyó los daños que los testigos declararon, a saber: (1) que se afectaba el derecho a la educación; (2) que se dejaba sin servicio y terapias de educación especial; (3) que no tenían forma para llegar a la escuela nueva; (4) que en Quebradillas se dejó toda el área rural sin escuela; (5) que los padres y estudiantes están agobiados por la incertidumbre de lo que sucederá el próximo año escolar; y (6) los problemas de las escuelas receptoras.

Como mencionamos, los padres demandantes no aducen que los criterios considerados por la Secretaria para cerrar planteles escolares constituyeron una clasificación sospechosa. Sus argumentos más bien se amparan en la interferencia con un derecho fundamental. Con el propósito

de evaluar la razonabilidad de la actuación del Estado, y así ver si se activa el escrutinio estricto —como lo hizo el foro primario— debemos examinar si el acto gubernamental interfirió directa y sustancialmente con el derecho a la educación. A continuación expondremos un resumen de la prueba desfilada en el Tribunal de Primera Instancia.

La Sra. Ashley Ríos Mercado testificó que sus dos hijas asistían a la Escuela Segunda Unidad Ramón Emeterio Betances de Arecibo en el año escolar de 2017-2018. Declaró que sus dos hijas sufrían mucho pues se sacó materiales de la escuela frente a ellas. Atestiguó que la escuela receptora estaba a más de treinta minutos en carro y a una hora si caminaba desde su casa. En su contrainterrogatorio, la señora Ríos admitió que el Departamento proveerá transportación a las escuelas.

La Sra. Xiomara Meléndez De León testificó que sus dos hijos estudiaron en la escuela Laurentino Estrella Colón en Camuy durante el año escolar 2017-2018. Declaró que visitó la escuela receptora y que el salón donde estará su hijo, de necesidades especiales, no cumple las exigencias, es pequeño, solo tiene una puerta y no posee servicios sanitarios. En el contrainterrogatorio, reconoció que no conoce los planes que tiene el Departamento para habilitar el salón previo al comienzo de clases.

La Sra. Ivette M. Montalvo Mendoza testificó que su hija de nueve años cursó sus estudios para el año escolar

2017-2018 en la escuela Rosa M. Rodríguez en Vega Baja. Declaró que una de las escuelas receptoras está ubicada en una urbanización que tiene solo una vía de entrada y de salida de 6:00 a.m. a 6:00 p.m., que a raíz del huracán perdió el techo de varias áreas y que se hizo un préstamo o se donó el dinero para arreglarlo. Relató que hizo una querella en OSHA ya que recibió unos correos electrónicos de los que se desprendía que la biblioteca tenía problemas de asbestos. Atestiguó que el nuevo plantel no tenía estacionamiento para los padres porque los propietarios de las casas de la urbanización no les permitían estacionarse dentro. Durante el contrainterrogatorio, admitió que no contaba con pericia para determinar las reparaciones que el Departamento llevaría a cabo para que el plantel receptor esté en condiciones para recibir a los estudiantes.

La Sra. Belmarie Reyes Aguilar testificó que es madre de dos menores que estudiaron durante el año escolar 2017-2018 en la escuela Ramón Ávila Molinari de Quebradillas. Declaró que sus hijos sufren daños emocionales, especialmente, su hija que comenzó sus estudios hace poco y que estaba en proceso de crear vínculos con los maestros y compañeros. Manifestó que si se cerraba este plantel escolar, la zona rural se quedaba sin escuelas primarias y que solo contarían con dos escuelas primarias en la municipalidad.

La Sra. Joanna López Medina testificó que es madre de tres hijos que cursaron el año escolar de 2017-2018 en la

escuela Joaquín Rodríguez Ruiz en Hatillo. Declaró que la escuela receptora ubica en una zona inundable, que tiene alumnos de nivel primario e intermedio, que solo tiene una cancha, que el área recreativa no posee techo, que solo tiene dos baños y que su calificación era C. Relató que el cierre ha ocasionado daños emocionales a su hija pues su madre y todos sus hermanos estudiaron en el plantel que va a ser cerrado. En el contrainterrogatorio, aceptó que la escuela receptora podía ser preparada y reparada para recibir la matrícula.

Somos de la opinión que, en el presente caso y a la luz de prueba testifical presentada por los padres demandantes, el proceder de la Secretaria al cerrar las seis escuelas que son objeto de revisión judicial no interfirió directa y sustancialmente con el derecho a la educación.[75] De la evidencia ofrecida se desprende que el Gobierno se comprometió a proveer a los estudiantes transportación hacia las escuelas receptoras. De igual modo, el Estado reconoció que va a preparar, habilitar y reparar los planteles escolares receptores de forma que estén acondicionados para el inicio de clases. También, se desprende de la prueba que se proveyó una escuela receptora a aquellos alumnos que cursaron estudios en planteles que serán cerrados. Surge, a su vez, que las escuelas receptoras se encuentran localizadas en la misma

---

[75] *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 DPR 248, 261 (1980). Si bien está fuera de discusión el carácter fundamental del derecho al voto,[…,] la Sec. 9 de la Ley Núm. 3 no afecta sustancialmente tal derecho".)

municipalidad de las escuelas a la que asistían los estudiantes durante el año escolar anterior. Además, el Estado se comprometió a hacer las reparaciones necesarias para ofrecer los servicios correspondientes de educación especial que tenían los estudiantes en las escuelas cerradas. Ninguno de los testigos declaró cómo, en efecto, se veían privados sus hijos del derecho a la educación. En consideración a estos antecedentes, concluimos que el Estado no interfirió sustancialmente con el derecho a la educación.

Como la actuación gubernamental no interfiere sustancialmente sobre el derecho a la educación procede examinar la razonabilidad de la actuación de la Secretaria y aplicar un escrutinio racional. Ello implica que la actuación se sostiene siempre que no sea arbitraria y tenga un nexo racional con los propósitos perseguidos. No hay duda, de que el cierre de escuelas obedeció a planificar la estructura administrativa del Departamento para maximizar los recursos disponibles y asegurar el buen uso de la propiedad pública. Su propósito respondió al interés público del Departamento de procurar un mejor y más efectivo uso de sus recursos. Esto, como parte de la responsabilidad de la Secretaria de velar por el sostenimiento de las escuelas públicas para que nuestras futuras generaciones gocen de ese beneficio importante. Estos fines constituyen intereses legítimos del Estado. En este caso, el cierre de los planteles es una medida que consideramos razonable para lograr la consecución del fin

del Estado, que es utilizar adecuadamente los recursos. Al así actuar, y para disipar la arbitrariedad, tomó en cuenta ciertos criterios como la matrícula de las escuelas, la infraestructura de los planteles, el aprovechamiento académico de las escuelas, los cursos que ofrecían y la transportación escolar. Indudablemente, el proceder decisional de la Secretaria supera el correspondiente escrutinio.

**IV**

Como hemos discutido, el criterio rector al determinar si procede un *injunction* permanente, es si el acto está comprendido dentro de la autoridad conferida en ley al funcionario gubernamental o de una corporación o agencia pública, y no si tal acción era válida o constitucional. Por lo tanto, los tribunales no podemos expedir un *injunction* en aras de evitar que un funcionario público lleve a cabo un acto para el cual fue autorizado por ley, salvo que haya mediado un dictamen por el cual se decrete su inconstitucionalidad. Excepcionalmente, procede la concesión del *injunction* si la actuación quebranta derechos constitucionales. En armonía con estos postulados, es preciso descartar los argumentos de los padres demandantes de que se infringieron sus derechos constitucionales. En consecuencia, nos vemos forzados a concluir que en el presente caso no procedía el *injunction* expedido por el tribunal sentenciador.

Según puntualizamos, la Ley 85 confirió a la Secretaria la facultad de **desarrollar la estrategia y manejo de las instalaciones escolares y establecer y regular la apertura, cierre, consolidación o reorganización de estas, previa determinación de necesidad. En virtud de esos poderes, esta decretó el cierre de los seis planteles escolares.** Por tanto, el *injunction* permanente es improcedente y contrario al esquema doctrinario imperante.

V

Por los fundamentos expuestos, estoy conforme con revocar en su totalidad el dictamen del foro primario y dejar sin efecto la orden de paralización del cierre de las escuelas objeto de este recurso y desestimar la demanda de autos.


                                        Edgardo Rivera García
                                           Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Xiomara Meléndez de León, *et al.*

Recurridos

v.

Hon. Julia Keleher, *et al.*

Peticionarios

_____

Municipio de Morovis, *et al.*

Recurridos

v.

Estado Libre Asociado de Puerto Rico, *et al.*

Peticionarios

CT-2018-0005

Opinión de Conformidad emitida por Juez Asociado señor COLÓN PÉREZ a la que se une la Juez Asociada señora RODRÍGUEZ RODRÍGUEZ.

> *Largo es el camino de la enseñanza por medio de teorías; breve y eficaz por medio de ejemplos.*
>
> Séneca

En San Juan, Puerto Rico, a 16 de julio de 2018.

Allá para los meses de mayo y junio de 2018, en escritos separados, un grupo de padres y madres de estudiantes de las escuelas públicas del país (específicamente de la Región Educativa de Arecibo) y de otra parte el Municipio de Morovis presentaron ante el

Tribunal de Primera Instancia una petición de *injunction* preliminar y permanente en la que solicitaron que se detuviera el cierre de ciertas escuelas públicas por parte del Departamento de Educación. En esencia, alegaron que en el cierre de las escuelas públicas en cuestión la mencionada agencia gubernamental no siguió los requisitos dispuestos en la Ley, Reglamentos o Cartas Circulares aplicables. A dicha solicitud, el Departamento de Educación se opuso. En síntesis, sostuvo que para el cierre de las escuelas públicas aquí en controversia se utilizaron criterios como la matrícula de estudiantes, la disponibilidad de espacio, los programas académicos, la oportunidad de crecimiento de las escuelas y su infraestructura, entre otros. Por lo que, a su juicio, actuó conforme a la normativa que gobierna estos asuntos. Evaluados los planteamientos de ambas partes, el Tribunal de Primera Instancia concedió el *injunction* solicitado. De esa determinación, el Departamento de Educación recurrió ante nos mediante recurso de certificación intrajurisdiccional.

Por entender que en nuestra jurisdicción, en virtud de la doctrina de separación de poderes, la facultad de decidir si una escuela pública permanece abierta, es cerrada o es consolidada le corresponde, en primera

instancia, al Poder Ejecutivo,[76] y por considerar que en el caso ante nuestra consideración no están presentes aquellas circunstancias -- de privación del derecho constitucional a una educación primaria y secundaria -- que ameriten la intervención del Poder Judicial con esa facultad delegada a otro de los poderes constitucionales de gobierno, estamos conformes con el resultado al que hoy llega este Tribunal donde se revoca la determinación del foro primario, en cuanto al *injunction* solicitado.

Y es que, como sabemos, la doctrina de separación de poderes es aquella que postula que, en un sistema republicano de gobierno, como lo es el del Estado Libre Asociado de Puerto Rico, cada uno de los tres poderes constitucionales de gobierno tiene facultades particulares, las cuales éstos están llamados a respetar entre sí, de manera tal que se impida la concentración indebida de poderes en uno solo de ellos. *Córdova y otros v. Cámara de Representantes,* 171 DPR 789, 799 (2007); *Colón Cortés v. Pesquera,* 150 DPR 724, 752 (2000); *Nogueras v. Hernández Colón*, 127 DPR 405, 426-427 (1990). En esa dirección, está claramente establecido que el Poder Legislativo es el llamado a formular las leyes, el Poder Ejecutivo a implementarlas y el Poder Judicial a interpretarlas y a asegurarse de que las mismas cumplan con

---

[76] Para quien suscribe, el decidir si una escuela pública permanece abierta, es cerrada o es consolidada es una **tarea eminentemente administrativa** en manos del Departamento de Educación de Puerto Rico.

lo dispuesto en nuestra Constitución. *Véase,* Const. ELA, LPRA Tomo 1.

De conformidad con lo anterior, en reiteradas ocasiones este Tribunal ha sentenciado que los tres poderes constitucionales deben ser cuidadosos de no extralimitarse ejerciendo funciones delegadas a otro de los poderes. *Rivera Schatz v. E.L.A. y C. Abo. PR II*, 191 DPR 791, 802 (2014); *Domínguez Castro v. E.L.A.,* 178 DPR 1, 91 (2010); *Colón Cortés v. Pesquera*, *supra*, pág. 750. En el caso particular del Poder Judicial -- tal y como hoy hacemos -- debemos ser en extremo cautelosos de no interferir en prerrogativas legislativas o ejecutivas. *Domínguez Castro v. E.L.A., supra; Colón Cortés v. Pesquera*, *supra*, pág. 752; *Noriega v. Hernández Colón*, *supra,* págs. 422-23.

Ciertamente, y como ya mencionamos, la facultad de decidir si una escuela pública permanece abierta, es cerrada o consolidada, a todas luces, es una **tarea eminentemente administrativa**, no reglamentaria, en manos del Departamento de Educación de Puerto Rico, que -- en lo relacionado al caso que nos ocupa -- dicha agencia gubernamental ejerce de conformidad con lo dispuesto en el Compendio de Políticas del Departamento de Educación, C-107. En ausencia de razones que lo justifiquen, no debemos intervenir con tal proceder delegado a otro de los poderes constitucionales de gobierno.

Ahora bien, lo anterior no es óbice para manifestar nuestra profunda preocupación con la forma y manera en que dicha rama de gobierno, a través de su Departamento de Educación, está llevando a cabo el proceso de cerrar y consolidar escuelas públicas en nuestro país.

Ello, pues, para quien suscribe -- **un juez formado en las escuelas públicas del país** --, el derecho constitucional a la educación primaria y secundaria, establecido en el Art. II, Sec. V de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*, no se salvaguarda meramente garantizando que el o la estudiante tenga una estructura física, es decir, una escuela, disponible para asistir. **El derecho constitucional a la educación primaria y secundaria, consagrado en nuestra Carta Magna, sólo se garantiza asegurándonos que el niño, la niña, el joven o la joven pueda llegar a esa escuela, reciba el pan de la enseñanza y logre su pleno desarrollo como hombre o mujer de bien.**

En ese sentido, somos de la opinión que la decisión de cerrar o consolidar escuelas públicas -- más allá de descansar meramente en el número de estudiantes, sean muchos o pocos, matriculados en cierta casa de estudios, como aparenta estar ocurriendo en el presente caso -- debe ser una que tome en cuenta el sentir de las comunidades donde ubican las mismas y las particulares situaciones que éstas enfrentan. Lo anterior, ciertamente, se logra a

través de procesos abiertos a la participación ciudadana donde todos los actores del triste drama humano que hoy atendemos -- entiéndase, padres, madres, estudiantes y personal del Departamento de Educación -- tengan la oportunidad de expresarse y puedan ser escuchados, aunque finalmente sea el Estado quien tome la decisión. No albergamos duda alguna de que procesos como esos expondrán a los funcionarios públicos llamados a la toma de decisiones en el asunto que nos ocupa a una diversidad de factores sociales, económicos, geográficos, de seguridad e infraestructura que bien pudiesen inclinar la balanza, de un lado o del otro, al momento de decidir si una escuela se cierra o es consolidada. Ello, a su vez, permitiría una determinación más completa, informada y cónsona con lo dispuesto en el Art. II, Sec. 5 de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*.

Recordemos que la mencionada disposición constitucional, en esencia, establece que:

> **Toda persona tiene derecho a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales. Habrá un sistema de instrucción pública el cual será libre y enteramente no sectario. La enseñanza será gratuita en la escuela primaria y secundaria y, hasta donde las facilidades del Estado lo permitan, se hará obligatoria para la escuela primaria. La asistencia obligatoria a las escuelas públicas primarias, hasta donde las facilidades del Estado lo permitan, según se dispone en la presente, no se interpretará como aplicable a aquellos que reciban instrucción primaria en escuelas**

**establecidas bajo auspicios no gubernamentales.**
Art. II. Sec. 5, Const. ELA, LPRA Tomo 1.

Distinto a lo sucedido en la creación de la Constitución de los Estados Unidos de América, a nuestros Constituyentes les pareció esencial que en la Constitución del Estado Libre Asociado de Puerto Rico se reconociera expresamente el derecho a la educación primaria y secundaria, de modo que éste no se concibiera como una simple y mera aspiración. *Véase*, 2 *Diario de Sesiones de la Convención Constituyente* 1455-1459 (1952). Al respecto, el delegado señor Virgilio Brunet expresó:

> Para que una democracia funcione en forma adecuada, es preciso que el derecho a la educación esté consignado, no solamente como un derecho del ciudadano, sino, además, debe contener aquella disposición que haga al Estado, que obligue al Estado a proporcionar un mínimo de educación para que los estudiantes, los niños, adquieran ese mínimo de preparación y puedan enfrentarse a una lucha sin desigualdades en una sociedad democrática. Diario de Sesiones, *supra*, pág. 1457.

Asimismo, y no conformes con lo anterior, en aras de reconocer un derecho a la educación de amplio alcance, los miembros de la Convención Constituyente dejaron meridianamente claro, en el texto constitucional bajo estudio, que los puertorriqueños y las puertorriqueñas tienen derecho a una educación primaria y secundaria "que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales". Al así hacerlo, adoptaron la acepción del derecho a la educación del Art. 26 y Art. XII

de la Declaración Universal de los Derechos Humanos y de la Declaración Americana de los Derechos y Deberes del Hombre, respectivamente.[77] Dicha concepción del derecho a la educación, reconoce la educación como el medio que "le permite al individuo, realizarse en lo interno, y a su vez como miembro de la familia, de la sociedad y como miembro del grupo social". Asociación Costarricense Pro-Naciones Unidas, *La Declaración de Derechos Humanos, Comentarios y Texto*, Ed. Juricentro S. A., 1979, pág. 1983. Es decir, una educación que "le prepare para la vida". *Íd.*

Precisa señalar también, que dicha educación primaria y secundaria será gratuita "hasta donde las facilidades del Estado lo permitan". *Véase*, Diario de Sesiones, *supra,* pág. 1460. Sobre el particular, los miembros de la Convención Constituyente señalaron que "[e]l Estado debe tener la obligación de educar al pueblo, debe ser lo suficientemente inteligente y cuidadoso, para economizar en ciertos

---

[77] El Art. 26 de la Declaración Universal de Derechos Humanos lee de la siguiente manera:
> 1. Toda persona tiene derecho a la educación. La educación debe ser gratuita, al menos en lo concerniente a la instrucción elemental y fundamental. La instrucción elemental será obligatoria. La instrucción técnica y profesional habrá de ser generalizada; el acceso a los estudios superiores será igual para todos, en función de los méritos respectivos.
> 2. La educación tendrá por objeto el pleno desarrollo de la personalidad humana y el fortalecimiento del respeto a los derechos humanos y a las libertades fundamentales; favorecerá la comprensión, la tolerancia y la amistad entre todas las naciones y todos los grupos étnicos o religiosos, y promoverá el desarrollo de las actividades de las Naciones Unidas para el mantenimiento de la paz.
> 3. Los padres tendrán derecho preferente a escoger el tipo de educación que habrá de darse a sus hijos.

aspectos administrativos y dedicar ese dinero a lo que es fundamental: la educación del pueblo". *Íd.*, pág. 1468.

En fin, como hemos podido notar en la normativa constitucional que antecede, una escuela pública es más que una estructura física. Una escuela pública la componen sus estudiantes, sus maestros y maestras, el personal del Departamento de Educación y la comunidad en general. Si bien reconocemos que el Poder Ejecutivo tiene la potestad, y está ejerciendo la misma, para ordenar el cierre o la consolidación de escuelas públicas en nuestro país, dicha determinación no debe ser una ajena a la comunidad donde esa escuela ubica y las particularidades -- sociales, económicas, geográficas, de seguridad e infraestructura, entre otras -- que rodean la misma. Ello, pues pudiese darse el caso que, al no tomarse en cuenta los mencionados factores, se tome una decisión que <u>directa o indirectamente</u> prive a las personas que allí residen del derecho constitucional a la educación primaria y secundaria. A juicio de quien suscribe, dicho escenario sí sería objeto de revisión judicial.

Lamentablemente, -- según se desprende del expediente ante nuestra consideración y, particularmente de los testimonios vertidos ante el Tribunal de Primera Instancia -- en el presente caso la parte demandante-recurrida no nos ha puesto en posición de determinar que ésta fue privada del derecho constitucional a la educación, primaria o

secundaria, o que los factores antes señalados no fueron tomados en consideración al momento de cerrar las escuelas públicas objeto del presente litigio. Falló al así no hacerlo y, en consecuencia, se cometió el error señalado.[78]

Para concluir, al igual que a los padres, madres y estudiantes aquí demandantes-recurridos, al juez que suscribe le entristece que las escuelas públicas de nuestro país se estén cerrando o consolidando. La realidad, no obstante, es que la difícil situación fiscal que enfrenta Puerto Rico obliga a ello.

Reconociendo lo anterior, sólo nos resta exhortar a todos los componentes del Poder Ejecutivo a que las economías o ahorros que se generen como producto del cierre o consolidación de escuelas en el país sean redirigidos a las escuelas públicas que permanezcan abiertas, de modo tal que allí, en cumplimiento con el mandato constitucional expuesto en el Art. II, Sec. 5 de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*, los y las estudiantes que aquí habitan tengan acceso a una educación pública de excelencia. Ellos y ellas, y todo el que aspira a construir un Puerto Rico mejor, se lo agradecerán.

---

[78] Es menester señalar que al momento de evaluar la procedencia de un *injunction* se deben examinar los siguientes criterios 1) la naturaleza del daño; 2) la irreparabilidad del daño o inexistencia de un remedio adecuado en ley; 3) la probabilidad de que la parte promovente prevalezca; 4) la probabilidad de que la causa de torne académica; 5) el posible impacto sobre el interés público; la diligencia y buena fe con que ha obrado la parte peticionaria. Regla 57.3 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 57.3; *Asoc. Vec. V. Caparra v. Asoc. Fom. Educ.*, 173 DPR 304 (2008); *Municipio de Ponce v. Rosselló*, 136 DPR 776 (1994); *P.R. Telephone Co. v. Tribunal Superior*, 193 DPR 200 (1975).

Si nos limitamos solamente a proveer una estructura física a nuestros niños, niñas y jóvenes -- estructura que llamamos escuela --, sin asegurarnos de que éstos y éstas tengan un acceso a ella y puedan educarse en las mismas, el derecho constitucional a la educación dejaría de ser un derecho y se convertiría en un ideal. Estoy seguro de que esa no fue la intención de los miembros de nuestra Convención Constituyente.

En fin, tal y como hemos sentenciado en el pasado en casos relacionados al tema de la educación, pero esta vez adaptado a las particularidades del presente litigio, no olvidemos nunca que "sin estudiantes no hay escuelas, y sin escuelas no hay país". *Menéndez González, et al. v. U.P.R.*, 198 DPR 140 (2017), págs. 147-148 (Op. Disidente, Juez Colón Pérez).


                                        Ángel Colón Pérez
                                        Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Xiomara Meléndez de León et al.<br><br>Recurrida<br><br>v.<br><br>Hon. Julia Keleher, et al.<br><br>Peticionaria<br>----------------------<br><br>Municipio de Morovis, et al.<br><br>Recurrida<br><br>Estado Libre Asociado de Puerto Rico, et al.<br><br>Peticionaria | CT-2018-005 | *Certificación Intrajurisdiccional* |

Opinión disidente emitida por el Juez Asociado señor ESTRELLA MARTÍNEZ

San Juan, Puerto Rico, a 16 de julio de 2018.

> "El derecho fundamental a la educación trasciende los factores de enseñanza y aprendizaje e incide sobre otros derechos de igual naturaleza tales como la vida, libertad y propiedad". Exposición de motivos, Ley de Reforma Educativa de Puerto Rico, Ley Núm. 85-2018, pág. 1.

El cierre de escuelas públicas es un fenómeno que afecta multiplicidad de comunidades en muchos rincones de los Estados Unidos y en el resto del mundo. Al igual que en Puerto Rico, el cierre en muchas ocasiones está basado primordialmente en una reducción de la matrícula de

estudiantes, una merma poblacional, la necesidad de reducir costos y eliminar escuelas con bajo rendimiento. De igual forma, las políticas y normas administrativas que regulan esos cierres están basadas en lo que parecieran ser un objetivo neutral, a saber: mejorar los servicios educativos con los recursos disponibles.

Ante esa realidad social y jurídica, la controversia ante nuestra consideración no se reduce a contestar si el Departamento de Educación (Departamento) tiene el poder de cerrar escuelas. Ciertamente, bajo nuestro ordenamiento jurídico tiene esa facultad. Ahora bien, ¿puede ejercerla en el vacío? A mi juicio no. ¿Están amparados los estudiantes de educación especial de garantías dirigidas a evitar que un proceso de cierre atropellado interfiera con su derecho a la educación? ¿Le asiste el derecho a los padres y madres de estudiantes de ser notificados oportunamente de las propuestas de cierres de escuelas, a fin de participar y tener acceso a la información para realizar una toma de decisiones responsable e informada en asuntos que el Tribunal Supremo federal ha reconocido como medulares, tales como el derecho de crianza de sus hijos e hijas? ¿Existen reclamos exitosos y legítimos de igualdad en la educación basados en cierres discriminatorios por razones vedadas constitucionalmente? ¿Está obligado el Departamento a realizar un procedimiento administrativo ordenado que promueva un adecuado uso de las facilidades

públicas, a fin de que las escuelas cerradas no se conviertan en un almacén de equipo y libros abandonados, frustrando así el objetivo de maximizar el uso de recursos? ¿Existe un reconocimiento de un derecho constitucional a la educación y normas que procuran observar un debido proceso de ley, a fin de evitar que un cierre abrupto de escuelas públicas interfiera irrazonablemente con los planes educativos individualizados y otras herramientas educativas que van dirigidas a procurar el bienestar y desarrollo de la niñez? ¿Existe la obligación del Departamento de garantizar una transición adecuada en la prestación de servicios individualizados, realizar evaluaciones previas y custodiar responsablemente los récords de los estudiantes?

A mi juicio, todas estas interrogantes debieron ser contestadas por este Tribunal en la afirmativa. Esperar a que las escuelas cerradas sean vandalizadas, los récords y el material educativo abandonados y que los estudiantes de educación especial vean frustradas sus garantías federales y estatales, conlleva irremediablemente no sólo al cierre de escuelas, sino también al cierre de la justicia. No se trata de otorgarle a los estudiantes o a los padres y madres, ni mucho menos a la Rama Judicial, un poder de veto contra el cierre de escuelas. De lo que se trata es de que el Estado ejerza su facultad dentro de los parámetros constitucionales y legales, y con el sentido

común que debe imperar en una sociedad democrática. Al no ser eso lo resuelto por una Mayoría de este Tribunal, respetuosamente me veo obligado a disentir.

Para una mejor comprensión de los fundamentos en los cuales baso mi disenso, procedo a exponer los detalles fácticos pertinentes al caso ante nos.

## I

El 24 de mayo de 2018 varios codemandantes-recurridos, todos padres de estudiantes en escuelas públicas de la Región Educativa de Arecibo, presentaron una primera petición de injunction preliminar y permanente en la que solicitaron que se prohibiera el cierre de seis escuelas por parte del Departamento.[79] Establecieron que esa agencia pública no siguió, para el cierre de estas escuelas, un procedimiento válido y razonable en el se incluyera a la comunidad escolar. Mucho menos que se hizo el estudio requerido, de conformidad con la Carta Circular 33-2016-2017 y la Ley de Reforma Educativa de Puerto Rico, Ley Núm. 85-2018. De esta forma, arguyeron que se violó su derecho fundamental a la educación, el debido proceso de ley y la igual protección de las leyes al no realizarse un procedimiento previo a las consolidaciones de las

---

[79]Presentaron esta petición de injunction la Sra. Xiomara Meléndez De León, la Sra. Joanna López Medina, el Sr. Rinaldi Fernández Pagán, la Sra. Ivette M. Montalvo Mendoza, la Sra. Carmen E. Rosario Rodríguez y la Sra. Zuleyma Maldonado Sierra. En ella demandaron a la Secretaria del Departamento de Educación, la Hon. Julia Keleher (Secretaria); la Directora de la Región Educativa de Arecibo del Departamento de Educación, la Dra. Maribel Colón González; al Departamento de Educación (Departamento) y al Estado Libre Asociado de Puerto Rico.

escuelas. Asimismo, alegaron la nulidad de la Serie C-107 (Serie C-107) del Volumen C del Compendio de Política del Departamento de Educación denominada Procedimiento y análisis para operación, rendición y consolidación por necesidad de las escuelas del sistema público de Puerto Rico para finales del año académico 2017-2018 (Compendio).

El 1 de junio de 2018 se llevó a cabo la vista correspondiente a la petición del injunction en la cual testificaron varias madres de los estudiantes de las escuelas a cerrar.[80] Específicamente, la Sra. Ashley Ríos Mercado, la Sra. Xiomara Meléndez De León, la Sra. Ivette M. Montalvo, la Sra. Belmarie Reyes Aguilar y la Sra. Joanna López Medina testificaron que el Departamento pretendía cerrar las escuelas a pesar de que nunca recibieron una notificación oficial a esos efectos. A su vez, indicaron que son madres que asisten a diario a las escuelas y que nunca observaron funcionarios del Departamento verificando las condiciones de las facilidades escolares. Por último, señalaron que sus hijos han estado sufriendo emocionalmente por el anuncio del cierre de sus escuelas.

---

[80]Cabe señalar que al comienzo de la vista, el Estado presentó una moción de desestimación la cual fue declarada no ha lugar por el Tribunal de Primera Instancia fundamentado en ser prematura. La moción establecía, en esencia, que el remedio solicitado constituía una intromisión indebida en el poder ejecutivo, que no procedía el recurso extraordinario del injunction y que no es de aplicación el debido proceso de ley en su vertiente procesal.

Luego de presentada la prueba de los codemandantes-recurridos, el Estado solicitó la desestimación, conforme la Regla 39.2 de las de Procedimiento Civil, 32 LPRA Ap. V, sec. 39.2. Esta fue declarada sin lugar por el Tribunal de Primera Instancia. No obstante lo anterior, la parte demandada se reiteró que era una controversia de derecho por lo que sometió su caso sin presentar prueba alguna. A esos efectos, el foro primario resolvió que procedía la solicitud de injunction preliminar y citó a las partes para una vista sobre un injunction permanente. Así también, ordenó que, mientras tanto, el Departamento cesara y desistiera de cerrar las escuelas.

El foro primario basó su decisión en que según la jurisprudencia, cuando hay una crisis fiscal y se pretenda afectar derechos adquiridos, se debe tener una reglamentación clara y precisa que sea de aplicación justa e imparcial para los afectados. De esa forma, concluyó que la prueba presentada sostuvo que el Departamento cierra las escuelas de forma arbitraria y caprichosa. Además, que no notificó adecuadamente a las partes. Asimismo, afirmó que la incertidumbre creada por el proceso llevado a cabo creó en los padres y estudiantes un daño emocional irreparable, peor que el mismo cierre de las escuelas. Por último, ordenó al Departamento presentar en la vista para

el <u>injunction</u> permanente evidencia que justificara su actuación conforme a su reglamentación.[81]

Por otra parte, el 6 de junio de 2018, los otros codemandantes-recurridos, de forma independiente, presentaron una demanda y una segunda solicitud de <u>injunction</u> preliminar.[82] Alegaron que el Departamento pretende cerrar unas escuelas en el Municipio de Morovis de forma arbitraria, ilegal y caprichosa, incumpliendo con el debido proceso de ley y causándole serios daños al afectarle el derecho constitucional a la educación. Arguyeron que el Departamento no utilizó criterios objetivos ni científicos para tomar la decisión. A su vez señalaron que el Departamento no informó de forma oficial del procedimiento de cierre. Más aún, la determinación se hizo sin considerar las opiniones, observaciones o

---

[81]El 4 de junio de 2018 los codemandantes presentaron una <u>Solicitud de Sentencia Parcial en torno a reglamentación aplicable al cierre de escuelas</u> en la que solicitaron que el Tribunal de Primera Instancia declarara nula la Serie C-107 del Volumen C del Compendio de Política del Departamento de Educación denominada <u>Procedimiento y análisis para operación, rendición y consolidación por necesidad de las escuelas del sistema público de Puerto Rico para finales del año académico 2017-2018</u>. Oportunamente, el Gobierno de Puerto Rico se opuso y solicitó que se desestimara la petición de <u>injunction</u>.

[82]Presentaron la demanda y la petición de <u>injunction</u> el Municipio de Morovis, representado por su Alcaldesa, la Hon. Carmen I. Maldonado González; la Sra. Aleida Villafañe Pagán; la Sra. Yamilleth Eidalgo Pérez; el Sr. Carlos Cardona Santiago; la Sra. Jackeline Reyes Ginés; la Sra. Aneysha Class; el Sr. Luis A. Salgado Camacho; la Sra. Karla M. Ortiz Meléndez y la Sra. Daisy J. Cruz Alvarado. En ella demandaron al Estado Libre Asociado de Puerto Rico y al Departamento a través de su Secretaria, la Hon. Julia Keleher.

sugerencias de la Alcaldesa, de los padres, estudiantes ni la comunidad escolar. Por último, argumentaron que el traslado de los menores les causa serias perturbaciones emocionales, psicológicas y afecta su desarrollo académico e intelectual.

Este segundo caso, mediante orden del Tribunal de Primera Instancia del 6 de junio de 2018, fue consolidado con la primera petición de injunction. De esta forma, el foro primario igualmente ordenó el cese y desista contra el Departamento y mientras tanto dejó sin efecto el cierre de las escuelas. Además, ordenó citar a las partes a la vista del 11 de junio de 2018 sobre el interdicto permanente.[83]

En la vista del 11 de junio de 2018, los codemandantes-recurridos de la segunda petición de injunction presentaron su prueba. Entre ella, testificó la Alcaldesa de Morovis, la Hon. Carmen Maldonado González y varios padres y madres de estudiantes de las escuelas a cerrar en ese municipio, entre ellos la Sra. Ingrid M. Santos Salinas, el Sr. Carlos Cardona Santiago, la Sra. Aleida Villafañe Pagán, la Sra. Daisy J. Cruz Alvarado, entre otros. De la regrabación de los procedimientos surge que, igual a los otros codemandantes-recurridos, éstos se enteraron de la determinación del cierre por medio de las

---

[83]El Estado presentó un recurso de certiorari ante el Tribunal de Apelaciones y una Moción en Auxilio de Jurisdicción. Esta última, fue declarada no ha lugar. Por tanto, el foro primario mantuvo jurisdicción sobre las controversias.

redes sociales, la página electrónica del Departamento y los periódicos. Asimismo, sostuvieron que las escuelas no fueron visitadas por el personal del Departamento antes de que se tomara la decisión del cierre de las escuelas.

Por su parte, el Departamento presentó su prueba correspondiente. Esta consistió, en primer lugar, en el testimonio de la Dra. Yanira I. Raíces Vega, Secretaria Auxiliar de Transformación, Planificación y Rendimiento. En esencia, explicó que para el cierre de escuelas se utilizaron criterios como la infraestructura, el cupo de estudiantes, la disponibilidad de espacio, la matrícula, los programas académicos y la oportunidad de crecimiento de las escuelas. En ese sentido, explicó que se hizo un análisis cualitativo y cuantitativo. **Sin embargo, aceptó que desconocía si el comité evaluador se reunió con la comunidad escolar**. Por último, sobre la notificación del cierre a los diferentes componentes escolares, expresó que hubo una comunicación oficial del Departamento a los directores escolares, quienes, a su vez, eran los responsables de notificar a los estudiantes, padres y la facultad. **Expresó desconocer si esa última fase se llevó a cabo efectivamente.**

En segundo lugar, testificaron la Sra. Judith Nieves Vélez, la Sra. Paula Rodríguez Homs, la Sra. Lourdes Heyliger Valentín y el Sr. Alberto Hernández Rojas, todos ellos ayudantes especiales. En sus testimonios expresaron, en síntesis, que participaron del proceso decisional para

el cierres de las escuelas. Entre sus funciones estuvieron el visitar las escuelas y recopilar información para proveerlas al comité evaluador.

Luego de presentada la prueba, el Tribunal de Primera Instancia resolvió conceder el injunction permanente y así mantener en vigor el cese y desista de cerrar las escuelas. A su vez, declaró nula la reglamentación aplicable al cierre de las escuelas. Fundamentó su decisión en que no existe un proceso ni un informe integral que concluyera de forma empírica cuáles escuelas se debían cerrar. Además, entendió que el método para la notificación de la determinación a la comunidad escolar fue a través de un comunicado de prensa, por las redes sociales y por medio de los directores escolares. En consecuencia, el foro primario resolvió que el Departamento no garantizó que los directores escolares cumplieran con notificar a la comunidad escolar. Por último, concluyó que el Estado no tenía un proceso diseñado para que los padres pudieran solicitar reconsideración o revisión administrativa o judicial de la decisión de la agencia.

Inconforme con tal proceder, el Gobierno de Puerto Rico acudió al Tribunal de Apelaciones y sostuvo que el Tribunal de Primera Instancia erró al denegar la moción de desestimación; al expedir el recurso del injunction a pesar que no se cumplió con los requisitos según la Regla 57.3 de las de Procedimiento Civil, 32 LPRA Ap. V, sec.

57.3; al expedir el injunction y en efecto impedir a la Secretaria del Departamento (Secretaria) llevar a cabo las facultades que le permiten la ley; al resolver que la consolidación de escuelas constituyó una violación al derecho a la educación y al debido proceso de ley; al declarar nula la Serie C-107, y por último, al reconocerle legitimación activa al Municipio de Morovis. Oportunamente, los codemandantes-recurridos se opusieron a la expedición del auto de certiorari.

No obstante, mientras se encontraba pendiente ante el foro apelativo intermedio el recurso de certiorari presentado, el Gobierno de Puerto Rico acudió antes nos mediante certificación intrajurisdiccional, en la cual incorporó los argumentos señalados en el recurso de certiorari ante el Tribunal de Apelaciones, y también presentó una Urgente Moción en Auxilio de Jurisdicción. A esos efectos, a esta última le proveímos no ha lugar, expedimos el recurso y le concedimos cinco días a los recurridos para que se expresaran. Cumpliendo con la orden emitida por este Tribunal, comparecieron los recurridos. En síntesis, sostuvieron las alegaciones realizadas en el foro primario.

Hoy, sin embargo, una Mayoría de este Tribunal decide lamentablemente revocar al Tribunal de Primera Instancia y determinar que el Departamento puede cerrar las escuelas sin que los padres, madres y estudiantes tengan los mecanismos ni los

procedimientos adecuados para cuestionar o expresar su posición al respecto. Sostienen que, a pesar que el derecho a la educación es un interés libertario protegido por la Constitución, en el caso de marras no aplica el debido proceso de ley dado a que la acción gubernamental alegadamente no incide de forma individual.

De esta forma, hoy se pierde la oportunidad de darle mayor contenido y ejecutabilidad a uno de los derechos más preciados que nuestra Constitución expresamente reconoce: la educación.

Por no estar de acuerdo con ese proceder, respetuosamente disiento. Como expresé, debimos aprovechar la ocasión para pautar los contornos procesales, dentro de los parámetros constitucionales y legales aplicables, para el cierre y consolidación de las escuelas públicas. Me explico.

## II

La educación de los pueblos, en no pocas ocasiones, está cimentada en la Declaración Universal de los Derechos Humanos. Puerto Rico no es la excepción. Véase, Exposición de motivos, Ley de Reforma Educativa de Puerto Rico, Ley-85-2018, págs. 6-7. En el Art. 26 de esa declaración se dispone lo siguiente:

> 1. Toda persona tiene derecho a la educación. La educación debe ser gratuita, al menos en lo concerniente a la instrucción elemental y fundamental. La instrucción elemental será obligatoria. La instrucción técnica y profesional habrá de ser generalizada; el acceso a los

> estudios superiores será igual para todos, en función de los méritos respectivos. 2. La educación tendrá por objeto el pleno desarrollo de la personalidad humana y el fortalecimiento del respeto a los derechos humanos y a las libertades fundamentales; favorecerá la comprensión, la tolerancia y la amistad entre todas las naciones y todos los grupos étnicos o religiosos, y promoverá el desarrollo de las actividades de las Naciones Unidas para el mantenimiento de la paz. 3. **Los padres tendrán derecho preferente a escoger el tipo de educación que habrá de darse a sus hijos.** (Énfasis suplido) Declaración Universal de Derechos del Hombre, A.G. Res. 217 (III) A, N.U. Doc. A/RES/217 (III) (10 de diciembre de 1948), http://www.un.org/es/comun /docs/?symbol=A/RES/217 (III),

Conforme a esos principios, sabido es que "la educación ocupa un sitial prominente en nuestro país". AMPR v. Srio. Educación, E.L.A., 178 DPR 253, 270 (2010). Tanto así, que el derecho a la educación tiene rango constitucional. Declet Ríos v. Depto. de Educación, 177 DPR 765, 773 (2009). A tales efectos, la Sec. 5 de la Carta de Derechos de nuestra Constitución establece, en lo pertinente, que "[t]oda persona tiene derecho a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales". Art. II, Sec. 5, Const. ELA, Tomo 1, pág. 292. Esa disposición es de tal importancia "que los miembros de la Asamblea Constituyente incluyeron 'el afán por la educación' como uno de los factores determinantes en

nuestra vida como pueblo democrático". AMPR v. Srio.

Educación, E.L.A., supra.

A raíz de ese precepto constitucional, este Tribunal

ha reconocido, tímidamente, la importancia del disfrute a

la educación. Como bien expresó el ex Juez Asociado señor

Rebollo López en su Opinión Concurrente en Bonilla v.

Chardón, 118 DPR 599 (1987):

> [La educación] *resulta de cardinal importancia para la subsistencia de nuestro actual sistema de gobierno y para el crecimiento y mejoramiento del mismo*. No debemos perder de vista que la delincuencia y la explotación del menos afortunado precisamente se nutren del analfabetismo y de la ignorancia de un pueblo. No cabe interpretar nuestra Constitución en una forma que fomente el discrimen: la falta de fondos para la educación nunca afecta a la clase pudiente; la que siempre resulta perjudicada por ello lo es la clase menos afortunada. Opinión concurrente del Juez Asociado señor Rebollo López en Bonilla v. Chardón, supra, pág. 621.

En ese interés, hemos considerado el derecho a la

educación, hace más de cuatro décadas, como uno

fundamental. Pagán Hernández v. U.P.R., 107 DPR 720, 737-

738 (1978). Más aún, utilizando como fundamento la

Convención Constituyente, expresamos que está comprendido

en el derecho a la vida. Amy v. Adm. Deporte Hípico, 116

DPR 414, 421 (1985).

En Bonilla v. Chardon, supra, este Tribunal se abstuvo

de considerar el ámbito del derecho a la educación bajo la

Constitución de Puerto Rico. Claro está, en aquel caso se

reconoció una causa de acción en daños y perjuicios a los

estudiantes con diversidades funcionales del programa especial que fueron trasladados sin razón a otra escuela que no disponía de los recursos físicos y humanos necesarios para garantizar su derecho a la educación. Al menos en aquella ocasión reconocimos un vehículo procesal para respaldar ese derecho fundamental. Hoy, ni siquiera se reconocen garantías mínimas de participación ciudadana.

Ante el balance de intereses en controversia, este Tribunal no debió continuar eludiendo pautar el alcance del derecho a la educación y de las garantías de los componentes de las comunidades escolares en el contexto de un proceso de cierre de escuelas públicas. En ese sentido, al igual que planteó la concurrencia en el caso de Bonilla v. Chardón, supra, no debimos ignorar un componente esencial de la base jurídica del reclamo de los recurridos, a saber: la Constitución de Puerto Rico. De esta forma, nos correspondía reconocer, sin ambages, que la educación es un derecho fundamental de rango constitucional.

Es decir, a la hora de dar contenido sustantivo a esa garantía fundamental, en los momentos claves, este Tribunal se ha quedado en el abstracto. Más reciente en Asoc. Maestros P.R. v. Srio. Educación, 137 DPR 528 (1994), tampoco se concretizó la aspiración de que el derecho fundamental a la educación cobrara mayor contenido equiparando las diferencias de sectores vulnerables que no han alcanzado la plenitud de ese derecho. Hoy, también

quedan en el abstracto las garantías procesales que respaldan ese derecho fundamental.

Así pues, hoy estábamos nuevamente obligados a no quedarnos en el abstracto y obviar que los derechos fundamentales requieren mecanismos para su reconocimiento y aplicación. La controversia que nos ocupa ocurre en una etapa administrativa previa a que esas potenciales desgracias puedan ocurrir con algunos de los componentes de las comunidades escolares. Hoy, estudiantes con diversas necesidades y que aspiran a mantener la plenitud de su derecho a la educación, tocan las puertas de la Rama Judicial para evitar que cierres de escuelas provoquen violaciones a garantías estatales y federales. Precisamente, el acceso a la justicia como derecho humano fundamental es la llave maestra que abre las puertas al ejercicio de derechos sustantivos. Véanse, Art. 1.002 (a) de la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico de 2003, Ley Núm. 201-2003, 4 LPRA sec. 24a (a); Declaración Principal de la VII Cumbre Iberoamericana de Presidentes de Cortes Supremas y Tribunales Supremos de Justicia 2 (29 de noviembre de 2002), http://www.cumbrejudicial.org/c/document_library/get_file?folderId=24801&name=DLFE-1012.pdf.

Por tanto, teníamos el deber de pautar el alcance del derecho constitucional a la educación en el contexto de la implantación de planes de cierres de planteles escolares y

proveer unas pautas que brinden el adecuado balance de

intereses. Por un lado, el interés del Estado en implantar

un plan de cierre de escuelas y, por otro lado, el interés

de las comunidades escolares de velar que durante ese

proceso se activen unas garantías dirigidas a que el

derecho a la educación no sea algo meramente abstracto, por

razón de que el traslado de estudiantes pueda violar alguna

norma estatal o federal, o lesionar garantías individuales

de estudiantes protegidos por estas.[84]

---

[84]No obstante el marco conceptual antes expuesto, resulta de suma importancia reconocer que si bien es cierto que el Tribunal Supremo de los Estados Unidos se ha negado a reconocer un derecho constitucional federal a la educación, ese mismo foro ha reconocido la suma importancia de la educación pública en la sociedad democrática en la que vivimos. Véanse, Papasan v. Allain, 478 U.S. 265, 285 (1986) ("As *Rodriguez* and *Plyler* indicate, this Court has not yet definitively settled the questions whether a minimally adequate education is a fundamental right . . . ".); Plyler v. Doe, 457 U.S. 202, 221 (1982) ("Public education is not a 'right' granted to individuals by the Constitution. San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1, 35, 93 S.Ct. 1278, 1298, 36 L.Ed.2d 16 (1973). But neither is it merely some governmental 'benefit' indistinguishable from other forms of social welfare legislation".); San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 35 (1973) ("Education, of course, is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected".); Plyler v. Doe, 457 U.S. 202, 221 (1982) ("We have recognized 'the public schools as a most vital civic institution for the preservation of a democratic system of government,' Abington School District v. Schempp, 374 U.S. 203, 230, 83 S.Ct. 1560, 1575, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring), and as the primary vehicle for transmitting "the values on which our society rests." Ambach v. Norwick, 441 U.S. 68, 76, 99 S.Ct. 1589, 1594, 60 L.Ed.2d 49 (1979). '[A]s ... pointed out early in our history, ... some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence.' Wisconsin v. Yoder, 406

U.S. 205, 221, 92 S.Ct. 1526, 1536, 32 L.Ed.2d 15 (1972). And these historic 'perceptions of the public schools as inculcating fundamental values necessary to the maintenance of a democratic political system have been confirmed by the observations of social scientists.' Ambach v. Norwick, supra, 411 U.S., at 77, 99 S.Ct., at 1594. In addition, education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all. In sum, education has a fundamental role in maintaining the fabric of our society. We cannot ignore the significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests".); San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 35 (1973) ("As we have said, the undisputed importance of education . . . ".); Wisconsin v. Yoder, 406 U.S. 205, 221 (1972) ("[S]ome degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence. Further, education prepares individuals to be self-reliant and self-sufficient participants in society".); Brown v. Bd. of Ed. of Topeka, Shawnee Cty., Kan., 347 U.S. 483, 493 (1954) ("Today, education is perhaps the most important function of state and local governments".); Meyer v. Nebraska, 262 U.S. 390, 400 (1923) ("The American people have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted".). Véase, además, Derek W. Black, The Constitutional Compromise to Guarantee Education, 70 Stan. L. Rev. 735 (2018) (arguyendo que el derecho a la educación es uno fundamental en la constitución federal, a la luz de las particularidades y hechos que suscitaron durante el proceso de la ratificación de la decimocuarta enmienda y le readmisión de los estados del sur).

Lo anterior no ha sido impedimento para que todos los estados de la unión, en sus respectivas constituciones, hayan establecido expresamente un derecho constitucional a la educación. Véanse, Ala. Const. Sec. 256; Alaska Const. Art. VII; Ariz. Const. Art. XI; Ark. Const. Art. XIV; Cal. Const. Art. IX; Colo. Const. Art. IX; Conn. Const. Art. VIII; Del. Const. Art. X; Fla. Const. Art. IX; Ga. Const. Art. VIII; Haw. Cons. Art. X; Idaho Const. Art. IX; Ill. Const. Art. X; Ind. Const. Art. VIII; Iowa Const. Art. IX; Kan. Const. Art. VI; Ky. Const. Sec. 183-189; La. Const. Art. VIII; Me. Const. Art. VIII; Md. Const. Art. VIII; Mass. Const. Ch. V; Mich. Const. Art. VIII; Minn. Const. Art. VIII; Miss. Const. Art. VIII; Mo. Const. Art. IX; Mont. Const. Art. X; Neb. Const. Art. VII; Nev. Art. XI; N.H. Const. Art. LXXXIII; N.J. Const. Art. VIII Sec. IV; N.M. Const. Art. XII; N.Y. Const. Art. XI; N.C. Const. Art.

## III

Esos principios constitucionales antes reseñados son los que conforman el andamiaje adecuado para que el gobierno mediante legislación promueva la educación. Conforme al mandato constitucional, tan reciente como el 29 de marzo de 2018 se aprobó la Ley de Reforma Educativa de Puerto Rico, Ley Núm. 85-2018. Esta legislación tiene como fin el fijar la nueva política pública del Gobierno de Puerto Rico en el área de educación. En lo pertinente, esta legislación promueve expresamente la revisión y desarrollo, por medio de consenso y estudio crítico-reflexivo-investigativo, el nuevo marco filosófico, sociológico, psicológico y neurocientífico del sistema de instrucción

---

IX; N.D. Const. Art. VII; Ohio Const. Art. VI; Okla. Const. Art. XIII; Or. Const. Art. VIII; Pa. Const. Art. III Secs. 14-15; R.I. Const. Art. XII; S.C. Const. Art. XI; S.D. Const. Art. VIII; Tenn. Const. Art. XI; Tex. Const. Art. VII; Utah. Const. Art. X; Vt. Const. Sec. 68; Va. Art. VIII; Wash. Const. Art. IX; W. Va. Const. Art. X; Wis. Const. Art. X; Wyo. Const. Art. VII.

Lo anterior no es casualidad. Durante el periodo de la readmisión de los estados del sur con posterioridad a la guerra civil, el Congreso les impuso a éstos ciertas condiciones para concederle la misma. Black, op. cit., pág. 779. Una de esas condiciones fue el que los estados consagraran en sus constituciones el derecho a la educación. Aunque finalmente la referida condición no fue avalada y adoptada, el profesor Derek W. Black sugiere que los estados al solicitar admisión conocían de las expectativas del Congreso en cuanto a que, en efectos, éstos adoptaran ese derecho. Por tal motivo, es que Black entiende que el derecho a la educación es uno implícito en los Estados Unidos. Black, supra, págs. 778-781. De igual modo, se puede razonablemente entender que a raíz de ese evento entre los restante estados surgió un consenso en cuanto a que el derecho a la educación es uno fundamental y que por tal razón debe ser estar garantizado constitucionalmente.

pública de Puerto Rico. A su vez, propende a fortalecer el modelo educativo en el cual el estudiante es el centro y eje principal de la educación y en el cual se **permite que las comunidades, incluyendo a los padres y madres, tengan un rol más activo en la educación de sus hijos**. A su vez, se reconoce la necesidad de un sistema de rendición de cuentas y la constante comunicación con la ciudadanía en general, entre otros asuntos.

En lo concerniente a la controversia ante nos, este estatuto faculta al Secretario o la Secretaria a esencialmente ser el administrador del Departamento; a implantar la política pública correspondiente; promulgar reglamentos y procedimientos; velar por la sustentabilidad del sistema preparando y manejando el presupuesto; establecer alianzas con diferentes entidades; velar por el bienestar físico y emocional de los estudiantes; establecer y supervisar los asuntos académicos y administrativos de todas las escuelas públicas de Puerto Rico, entre otros. Además de todas esas facultades, la ley autoriza expresamente al Secretario o Secretaria a "[e]stablecer y regular la apertura y cierre, consolidación y/o reorganización de las instalaciones donde operan las escuelas públicas de Puerto Rico, previa determinación de necesidad. Disponiéndose que, para el cierre, consolidación y/o reorganización de las instalaciones, el Secretario seguirá el procedimiento establecido en el Artículo 8.01,

inciso (f) de esta Ley". Ley Núm. 85-2018, Art. 2.04(14). De esta forma, queda meridianamente claro que el Secretario tiene la facultad para consolidar y cerrar escuelas. La interrogante es, ¿qué procedimiento es requerido para esos propósitos de conformidad con las garantías aplicables?

El Art. 8.01 inciso (f) dispone que a partir del 1 de julio de 2018, antes del cierre o consolidación de una escuela se debe preparar un estudio con indicadores de medición. El mismo artículo dispone la información que debe tener el estudio y ordena que debe estar a la disposición del público en el distrito escolar y en la página de internet. Indistintamente de que el proceso de cierre haya comenzado antes de esa fecha, examinemos las garantías que inexorablemente debe respetar el estado.

Los recurridos alegan que es de aplicación la Carta Circular 33-2016-2017. En ésta se disponen los criterios generales que se deben evaluar para el rediseño de las escuelas.[85] Así también, establece el procedimiento para el análisis y evaluación de las escuelas. Particularmente, dispone que debe haber un comité evaluador compuesto por personal del nivel central, la región educativa y el distrito escolar. Estos tomarán la información obtenida del director escolar, maestros, padres, madres, estudiantes, vecinos, alcaldes y otras entidades. Ese comité evaluador

---

[85]Los criterios a tomar son, entre otros, los informes estatales y federales; la infraestructura; el rendimiento académico; la transportación escolar.

deberá someter a la Secretaria los resultados del análisis y sus recomendaciones finales del rediseño. Por último, la Secretaria deberá comunicar su determinación por escrito.

Por su parte, los peticionarios establecen que esa Carta Circular fue revocada por el Compendio. De esa forma, establecen que el proceso a seguir es el establecido en ese Compendio, específicamente, lo establecido en la Serie C-107. Allí se dispone el proceso de consolidación de escuelas. Los criterios utilizados y el proceso establecido son bastante similares a los establecidos en la Carta Circular. Se establece un comité evaluador que debe hacer una recomendación a la Secretaria, y ésta última comunica su determinación por escrito. Sin embargo, esta Serie C-107 no establece que se debe tomar en cuenta la información del director escolar, maestros, padres, madres, estudiantes, vecinos, alcaldes y otras entidades.

Para resolver si la Serie C-107 es de aplicación al caso de autos o, en cambio, es nulo estamos obligados a primero examinar los contornos del debido proceso de ley.

**IV**

**A.**

Nuestra Constitución establece que ninguna persona será privada de su libertad o propiedad sin un debido proceso de ley. Art. II, Sec. 7, Const. ELA, Tomo 1. Igual derecho establece la Constitución de los Estados Unidos en las Enmiendas V y XIV. Conocido es que el debido proceso de

ley tiene dos dimensiones: la sustantiva y la procesal. En lo importante para el caso de autos, esta segunda dimensión, la procesal, "le impone al Estado la obligación de garantizar que la interferencia con los intereses de libertad y propiedad del individuo se haga a través de un procedimiento que sea justo y equitativo". Rivera Rodríguez & Co. v. Stowell, etc., 133 DPR 881, 887-888 (1993). Para que ese derecho aplique, según la Constitución, el primer paso es determinar si está en juego un interés individual de libertad o propiedad. Díaz Carrasquillo v. García Padilla, 191 DPR 97, 110-111 (2014). Es decir, si el Estado interviene con algún interés propietario o libertario del individuo se requiere algún debido proceso de ley. D. Fernández Quiñones, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme, 3ra ed., Forum 2013, sec. 6.3, pág. 405.

Ambos intereses han sido interpretados por los tribunales. En lo pertinente, el derecho a la libertad ha sido interpretado más allá de la restricción física. La libertad incluye circunstancias como las relaciones paterno-filiales,[86] el interés de un padre en criar a su hijo,[87] el interés que una agencia cumpla con las pautas

---

[86]Véase, Santana Medrano v. Acevedo Osorio, 116 DPR 298 (1985).

[87]Véase, Estrella, Monge v. Figueroa Guerra, 170 DPR 644 (2007).

reglamentarias que ha adoptado[88] y el interés de adquirir conocimiento.[89] Véase, J.J. Álvarez González, Derecho Constitucional de Puerto Rico, Bogotá, Ed. Temis, 2010, pág. 608.

## B.

Como he mencionado, dos aspectos incluidos en el interés libertario son la educación y la crianza de los hijos. Sobre este último, el derecho constitucional de los padres y madres a criar, cuidar y custodiar a sus hijos e hijas, el Tribunal Supremo de los Estados Unidos ha expresado que "[t]he history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition". Wisconsin v. Yoder, 406 U.S. 205, 232 (1972).

Ese derecho fue expresamente reconocido por el Tribunal Supremo federal en Meyer v. Nebraska, 262 U.S. 390 (1923), mediante la siguiente expresión:

> While this court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the

---

[88]Véase, Torres v. Junta Ingenieros, 161 DPR 696 (2004).

[89]Véase, Pagán Hernández v. UPR, 107 DPR 720 (1978).

> common occupations of life, to acquire useful knowledge, to marry, **establish a home and bring up children**, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men. (Énfasis suplido) Meyer v. Nebraska, supra, pág. 399.

De esa forma, fue que se liberalizó el significado de la palabra libertad según contenida en la Decimocuarta Enmienda, a los fines de incluir otras protecciones más allá de la mera libertad física. No obstante, en ese momento se dio un alcance limitado a ese derecho en tanto y cuanto se circunscribió al derecho de los padres y madres a decidir el desarrollo educativo de sus hijos e hijas. Meyer v. Nebraska, supra, pág. 400 ("The American people have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted. Corresponding to the right of control, it is the natural duty of the parent to give his children education suitable to their station in life; and nearly all the states, including Nebraska, enforce this obligation by compulsory laws".).

Dos años luego de haber decidido Meyer v. Nebraska, supra, el Tribunal Supremo de los Estados Unidos retomó el tema del derecho de los padres a la crianza y educación de sus hijos e hijas en Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary, 268 U.S. 510 (1925). En esa ocasión, el Tribunal Supremo federal se enfrentó a una

legislación estatal que obligaba a los niños y niñas a asistir a la escuela pública del distrito donde estos residieran. Incurría en delito menos grave el padre o madre que incumpliere con el referido mandato. En respuesta, varias escuelas privadas impugnaron la medida por, entre otras cosas, interferir con el derecho de los padres y madres a decidir cómo educar a sus hijos y a cuál escuela enviarlos para fines de éstos recibir esa educación. Explicando de mejor forma el alcance y la justificación de ese derecho, el máximo foro federal expresó que "[children are] not [] mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare [them] for additional obligations". Íd., pág. 535. De igual modo, basándose en Meyer v. Nebraska, supra, dispuso que la legislación en pugna indebidamente interfería con la libertad de los padres y madres a dirigir, criar y educar a los niños y niñas bajo su control. Íd., págs. 534-535. Es decir, amplió y dio un contexto completo respecto a la extensión del derecho de los padres y madres en controlar y dirigir la crianza de sus hijos e hijas. Ello, pues sugirió que ese derecho aplica a asuntos no estrictamente relacionados a la educación de estos.

Finalmente, ese mismo foro ha expresado de manera clara y tajante que "[i]t is cardinal with us that the custody, care and nurture of the child reside first in the

parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder". Prince v. Massachusetts, 321 U.S. 158, 166 (1944). Ese derecho constitucional ha sido reiterado en varias ocasiones por el máximo foro federal. Véanse, Obergefell v. Hodges, 135 S. Ct. 2584, 2600 (2015)("The Court has recognized these connections by describing the varied rights as a unified whole: '[T]he right to 'marry, establish a home and bring up children' is a central part of the liberty protected by the Due Process Clause'".); Washington v. Glucksberg, 521 U.S. 702, 720 (1997) ("In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the . . . right[] to direct the education and upbringing of one's children . . .".); Santosky v. Kramer, 455 U.S. 745, 753 (1982)("The absence of dispute reflected this Court's historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment".); Quilloin v. Walcott, 434 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected".); Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632, 639–640 (1974) ("This Court has long recognized that freedom of personal choice in matters of marriage and family life is

one of the liberties protected by the Due Process Clause of the Fourteenth Amendment".).

Por otro lado, aunque nuestro ordenamiento está escaso de pronunciamientos mayoritarios en torno al derecho constitucional antes analizado, en Rexach v. Ramírez, 162 DPR 130(2004), este Tribunal estableció que "indudablemente *en Puerto Rico los padres y madres tienen un derecho fundamental a criar, cuidar y custodiar a sus hijos, protegido tanto por la Constitución del Estado Libre Asociado de Puerto Rico como por la Constitución de Estados Unidos*". Íd., pág. 148.

## C.

Teniendo en mente que el debido proceso de ley en su vertiente procesal aplica cuando se pretende afectar un interés libertario incluyendo el derecho a adquirir conocimiento y el de criar a sus hijos, debemos examinar el hecho que se afecte de forma individual. Es decir, debemos analizar qué significa un "interés individual" conforme lo ha requerido nuestra jurisprudencia y la del Tribunal Supremo federal.

De las posturas que avalan el dictamen mayoritario, se revela que la actuación validada del Departamento, en cuanto al cierre de algunos planteles escolares, es una de aplicación general y policy based. Asimismo, se sugiere que

el agravio que sufren los recurridos es uno que sólo puede ser atendido por la vía política, mas no por los tribunales. Para sostener su determinación, algunos miembros de la Mayoría citan varios casos del Tribunal Supremo federal que hacen una distinción entre hechos adjudicativos y legislativos. En el primero, se activa el debido proceso de ley, mientras que en el segundo no. Así, alcanzan a determinar que, en el caso ante nos, el debido proceso de ley no aplica.

Gran parte de ese raciocinio descansa en lo decidido por el Tribunal Supremo de los Estados Unidos en Bi-Metallic Inv. Co. v. State Bd. of Equalization, 239 U.S. 441 (1915). En esa ocasión, varios organismos administrativos del estado de Colorado determinaron aumentar el valor de las propiedades en 40% para fines contributivos. Consecuentemente, un dueño de bienes raíces impugnó esa determinación, toda vez que no se le brindó la oportunidad de ser escuchado en el proceso que conllevó a la aprobación de la referida determinación. Al disponer de la controversia, el máximo foro federal dispuso que la Constitución no requiere que se le provea audiencia a los ciudadanos en cualquier acto público que realice el gobierno. Así, dispuso que el único derecho que tiene un ciudadano para ser escuchado en la aprobación de estatutos o en el ejercicio de ciertas determinaciones que sean de aplicación general es aquel brindado naturalmente por el

proceso político en una sociedad democrática; el poder de votar. Por tal motivo, entendió que en ese caso no era necesario brindarle al demandante la oportunidad de ser escuchado, toda vez que el estatuto en cuestión era uno de aplicación general.[90]

Ahora bien, distinto fue el caso cuando ese tribunal se enfrentó a la controversia plasmada en Londoner v. City & Cty. of Denver, 210 U.S. 373 (1908). En ese caso, el máximo foro federal, distinto a lo decidido en Bi-Metallic Inv. Co. v. State Bd. of Equalization, supra, determinó que ciertas personas tenían derecho a ser escuchados previo a la aprobación de un impuesto. Ello, pues, en ese caso en particular, la legislatura del estado, en vez de fijar el impuesto, delegó ese poder a una junta local, la cual tenía entera discreción para determinar establecer un impuesto, el porcentaje del mismo y a quién imponérselo. De ese modo, determinó que cuando ese sea el marco jurídico, las personas que estarán sujetas a ese impuesto tendrán un derecho a ser escuchadas sobre el mismo, previo a su aprobación. Londoner v. City & Cty. of Denver, 210 U.S. 373, supra, págs. 385-386. ("But where the legislature of a

---

[90]Un punto importante que debemos resaltar es que en este caso se fundamentó la decisión en lo siguiente: el número de personas que hubiera tenido que escuchar la junta; que los que estuvieran en desacuerdo podían utilizar la elecciones para sacar a los representantes de la junta; que la decisión fue de carácter general y no individualizada, **y que cada propietario individualmente podía cuestionar la evaluación individual de su propiedad en la factura**. D. Fernández Quiñones, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme, 3ra ed., Forum 2013, sec. 6.4, pág. 407.

state, instead of fixing the tax itself, commits to some subordinate body the duty of determining whether, in what amount, and upon whom it shall be levied, and of making its assessment and apportionment, due process of law requires that, at some stage of the proceedings, before the tax becomes irrevocably fixed, the taxpayer shall have an opportunity to be heard, of which he must have notice, either personal, by publication, or by a law fixing the time and place of the hearing".).

Por otro lado, un sector de la Mayoría recurre a un artículo del Profesor Meléndez Juarbe para sustentar su postura. Véase, H.A. Meléndez Juarbe, Derecho Constitucional, 75 Rev. Jur. UPR 29 (2006). En este, el profesor sostiene que cuando el Estado, con sus actuaciones, afecta a ciertos individuos y sus derechos, entonces éstos últimos estarán protegidos por la Constitución. Íd., pág. 38. Pero cuando el Estado actúa de manera general sobre el pueblo, éste sólo tendrá disponible los canales políticos para atender su agravio personal. Íd., pág. 37. Ahora bien, no debemos omitir algunos contornos del artículo citado. En ese sentido, Meléndez Juarbe indica que cuando a unos ciudadanos se les "quita algo", ese algo siendo un derecho propietario o libertario, entonces serán de aplicación las protecciones constitucionales. Íd., pág. 40. Nótese, además, que gran parte de lo abordado por éste se relaciona al marco

jurídico relacionado al derecho administrativo. A esos efectos, dispuso lo siguiente:

> Es por esto que las determinaciones de política pública de las agencias administrativas ocurren mediante un procedimiento estatutario de reglamentación que sólo como cuestión legal (no constitucional) requiere participación pública; mientras que las adjudicaciones activan el marco de análisis del debido proceso pautado por *Mathews v. Eldridge*. **Ello, claro está no impide que en un procedimiento estatutario de reglamentación a su vez se tomen determinaciones que en un sentido constitucional impliquen una adjudicación, siempre que el procedimiento se ajuste para cumplir las garantías mínimas del debido proceso de ley.** Es por esto también que determinaciones de política pública tomadas por la Asamblea Legislativa pueden adoptarse sin participación pública alguna (como, por ejemplo, la tasa contributiva aplicable a un impuesto por ventas y uso) **mientras que la aplicación de esa determinación a unos hechos particulares sí lo requiere** (ante el alegado incumplimiento de la ley por un individuo). (Énfasis suplido) Íd., pág. 37.

Ante lo expuesto por el dictamen mayoritario, es importante destacar la distinción entre los hechos adjudicativos y los hechos legislativos resaltada por el Profesor Fernández Quiñones siguiendo lo expresado por el Profesor Davis. Éste indica que los hechos adjudicativos son los que tienen que ver con "'las partes, sus actividades, negocios y propiedad'. Mientras que los segundos, por regla general, no están relacionados con las partes, en forma inmediata. Son hechos que ayudan a los tribunales a decidir las cuestiones de derecho y política que se le presentan". Fernández Quiñones, op. cit., sec. 6.4, pág. 408. En el caso ante nos, no estamos ante hechos legislativos. Los reclamos que están en disputa en este

caso no están "distanciados de la vida de las partes y de su conocimiento". Íd. Mucho menos están lejos de no contribuir a su desarrollo como dispone el Profesor Fernández Quiñones. Por tanto, debería ser de aplicación el debido proceso de ley.

Lo anterior cobra mayor relevancia cuando traemos a colación que este Tribunal omite reconocer el derecho de los padres y madres a la crianza y educación de sus hijos. Así, vemos como, en efecto, se ignora que existen derechos constitucionales fundamentales en pugna a base de la actuación gubernamental en controversia.

Nótese que, en el caso ante nos, la actuación por parte del Departamento no es una mera determinación en virtud de determinada política pública. Tampoco se puede asimilar tal proceder con un acto legislativo, en el cual los representantes elegidos por el pueblo aprueban leyes de aplicación general. La referida actuación es una específica que atenta contra ciertos planteles escolares en particular. Ante ese acto, son ciertos estudiantes en específico a los que se les vulnera su derecho a la educación. De igual modo, son ciertos padres a los que se le ve afectado el derecho de crianza y educación de sus hijos. Ello, pues el cierre de planteles escolares ciertamente afecta los planes de crianza que estos padres tenían para con sus hijos. Ahora bien, no se trata de decir si la Secretaria poseía ese poder, ciertamente lo posee. Lo

medular es que a la luz de esos dos intereses antes mencionados había que brindar un proceso, en el cual los padres de estos estudiantes pudieran expresar sus preocupaciones, participar para velar el cumplimiento de los planes educativos individualizados, discutir alternativas y brindar soluciones, con el fin de salvaguardar y proteger el derecho de estos sobre sus hijos. Nótese que nada de lo anterior se hizo.

**D.**

Tan pronto se determine que se requiere algún tipo de debido proceso de ley por intervenirse con un interés de propiedad o libertad es necesario precisar el momento en que hay que conceder el debido proceso de ley. Para ello el Profesor Fernández Quiñones explica que, como regla general, "el debido proceso de ley se concede antes de que sea efectiva la determinación administrativa". Fernández Quiñones, op. cit., pág. 405.

Luego de determinar la etapa en que es requerido el debido proceso de ley, hay que examinar los elementos específicos del procedimiento. Fernández Quiñones, op. cit., pág. 406. Es decir, hay que determinar cuál es el procedimiento exigido (what process is due). P.A.C. v. E.L.A. I, 150 DPR 359, 376 (2000). Diversas situaciones pueden requerir diferentes tipos de procedimientos. Para determinar cuál procedimiento es el exigido, se toman en consideración los siguientes criterios: (1) cuáles son los

intereses individuales afectados por la acción oficial; (2) el riesgo de una determinación errónea que prive a la persona del interés protegido mediante el proceso utilizado y el valor probable de garantías adicionales o distintas, y (3) el interés gubernamental protegido con la acción sumaria y la posibilidad de usar métodos alternos. Íd. Como parte de esos criterios, la jurisprudencia ha reconocido que es requisito del debido proceso de ley lo siguiente: "(1) notificación adecuada del proceso; (2) proceso ante un juez imparcial; (3) oportunidad de ser oído; (5) derecho a contrainterrogar testigos y examinar evidencia presentada en su contra; (6) tener asistencia de abogado, y (7) que la decisión se base en el record". Rivera Rodríguez & Co. v. Stowell, etc., supra, pág. 889. Con relación a la notificación, este Tribunal ha expresado que su importancia radica en que es necesario para que la parte afectada pueda ejercer el derecho que entienda que procede. Plan de Salud Unión v. Seaboard Sur. Co., 182 DPR 714 (2011); Dávila Pollock et als. v. R.F. Mortgage, 182 DPR 86 (2011). Y es que tenemos que tener presente que el debido proceso de ley es la protección principal contra privaciones arbitrarias. Rivera Rodríguez & Co. v. Stowell, etc., supra.

**V**

Normalmente, cómo los ciudadanos van a incorporarse en los procesos gubernamentales dependerá del tipo de procedimiento que se esté llevando a cabo ante la agencia.

En otras palabras, generalmente dependerá de si es un procedimiento de reglamentación o de adjudicación. La distinción al respecto es sobre quién es parte en cada procedimiento. Por un lado, en el caso de los procedimientos de reglamentación, la persona que participa no es considerada parte, debido a que se entiende que la norma a pautarse es de aplicación general. Por otro lado, aquel que participa en el proceso adjudicativo, y cuyos derechos y obligaciones pueden verse afectados, debe ser considerado como parte en el proceso. Ciertamente, esto se debe a que el resultado del proceso es de aplicación particular. Véanse, Fund. Surfrider y otros v. A.R.Pe., 178 DPR 563, 586 (2010); JP, Plaza Santa Isabel v. Cordero Badillo, 177 DPR 177, 188 y 191 (2009).

Aparte de esa visión tradicional, existen voces que cuestionan la justificación de la política jurídica que priva a una persona que participa de un proceso de reglamentación de ser notificada. A modo de ejemplo, la Profesora Érika Fontánez Torres considera que estos todavía son los remanentes de aquella visión gerencial, en la cual se consideraba que las agencias eran expertas. É. Fontánez Torres, El derecho a participar: Normas, estudios de caso y notas para una concreción, 68 Rev. Col. Abog. PR 631 (2007). Además, esta visión está enmarcada en la noción de la representación como motor de la democracia, con la consecuencia de no fomentar el rol de la participación en

el mantenimiento y desarrollo de ese sistema democrático. Véanse, C. Coglianese, Citizen Participation in Rulemaking: Past, Present and Future, 55 Duke L.J. 943 (2006); C.A. Atehortua Ríos, El Derecho Administrativo en Colombia y la modernización del Estado, 2 Rev. Derecho del Estado 131 (1997).

De esta forma se cuestiona si no resulta un contrasentido que a mayor grado de aplicación de una acción administrativa dentro del poder reglamentario, existan menos garantías de participación ciudadana. ¿Acaso esa acción de reglamentación no podría desembocar en un eventual proceso cuasi-judicial? ¿Podrían resultar tardías las garantías contenidas en el proceso adjudicativo? Estas interrogantes han sido atendidas efectivamente en otras jurisdicciones que fomentan un mayor grado de participación en el proceso de reglamentación. En nuestra jurisdicción aún no han sido atendidas.

Por tanto, la controversia ante nos constituía una oportuna ocasión para fortalecer las garantías del debido proceso de ley en ese contexto. De esa forma, este Tribunal podía aprovechar la oportunidad y contestar las interrogantes antes planteadas. Y es que, ¿acaso las normas administrativas y el proceso de cientos de escuelas públicas no tiene un efecto mucho mayor que un acto individual de adjudicación y un alcance más amplio que un acto cuasi-legislativo de la agencia? ¿Cómo ignorar que el

proceso de cierre de las escuelas por parte del Departamento conlleva el acto de emitir normas de aplicación general pero que inciden directamente en comunidades escolares fácilmente identificables por esa agencia? ¿Cómo ignorar que cada cierre de escuela conlleva un proceso de evaluación individual de cada expediente de estudiantes para asegurar el cumplimiento de los requisitos de las normas federales y las garantías constitucionales que cobijan a los estudiantes del sistema? Ante la existencia de un estado de derecho que sustantivamente provee unas garantías, no podemos validar la ausencia de una notificación adecuada. Sin unos procedimientos efectivos para las reclamaciones de la gente común, los derechos serán simbólicos.[91]

El acceso a la justicia como un derecho humano fundamental y el debido proceso de ley exigen un mayor grado de reconocimiento y apertura a la participación ciudadana en un proceso administrativo que impacta la vida de cientos de comunidades escolares. No estamos ante un reclamo individual solamente, ni ante un mero reglamento insignificante. Es imposible que ese tipo de proceso ofrezca unas garantías de notificación en virtud del debido proceso de ley y que, ante el proceso formal de cierre de cientos de escuelas, nos hagamos de la vista larga a la

---

[91] Véase, M. Cappelletti & B. Garth, Access to Justice: The Newest Wave in the Worldwide Movement to Make Rights Effective, 27 Buff. L. Rev. 181, 183 (1978).

hora de servir de contrapeso al ejercicio del poder del Estado.

El propio Estado lo reconoce al establecer diáfanamente y en la primera oración de la exposición de motivos que "[e]l derecho fundamental a la educación trasciende los factores de enseñanza y aprendizaje e incide sobre otros derechos de igual naturaleza tales como la vida, libertad y propiedad". Exposición de motivos, Ley de Reforma Educativa de Puerto Rico, Ley Núm. 85-2018, pág. 1. Y es que tiene que ser así porque la educación incide en múltiples esferas de la vida familiar.

Todo lo anterior lo reafirma la propia ley en varias de sus disposiciones. La ley es clara al reconocer en multiplicidad de esferas la participación ciudadana y la oportunidad de que los padres, madres y estudiantes sean escuchados y notificados en las diferentes facetas de la educación de nuestra niñez. Veamos.

En primer lugar, el Art. 1.02 de esa ley establece como unos de sus pilares esenciales el que las escuelas tengan que desarrollar estrategias con el fin de contar con el compromiso y participación de las comunidades. De igual forma, ese artículo establece que "las escuelas deben buscar integrarse al desarrollo comunitario mediante su interacción con otras agencias del Estado y colaborando entre éstas para atender las necesidades de la escuela y de la comunidad". Ley Núm. 85-2018, Art. 1.02(7). Además, el

estatuto "requiere la participación de todos los sectores de la sociedad". Íd., (8).

Los actores principales de la comunidad escolar -el estudiante- también expresamente tiene en la ley vigente unas garantías de participación en el Art. 1.002(e)(10). Particularmente, se dispone que la escuela deberá promover que el estudiante desarrolle una "[c]onciencia de sus derechos y deberes ciudadanos y la disposición para **ejercerlos mediante la participación en decisiones de la comunidad**". (Énfasis suplido) Ley Núm. 85-2018, Art. 1.02(e)(10). Sería un contrasentido pautar que esa política pública de promover que el estudiante participe en las decisiones de impacto comunitario, paradójicamente, implique excluirlo **totalmente** <u>a priori</u> de los procesos de cierre y que tenga que enterarse posteriormente en redes sociales.

Por otro lado, la ley establece que los estudiantes tendrán el derecho, en lo pertinente, a que "se le escuche regular y sistemáticamente, para que puedan expresar sus opiniones oportunamente, en forma ordenada y respetuosa, manteniendo autocontrol, y mientras no interfiera con los procesos de enseñanza de la escuela". Art. 9.01(o). De otra parte, la ley le reconoce a los padres el derecho a "[r]ecibir información sobre el desempeño académico del estudiante y **todo lo concerniente a su educación**". (Énfasis suplido) Art. 11.01(b). Así también, tienen derecho a

"[r]ecibir regularmente y tener acceso a la información sobre el desempeño académico **y administrativo de la escuela, de manera clara y transparente**". (Énfasis suplido) Íd., Art. 11.01(c). Por último, la ley los faculta a exigir que se "le dé oportunidad, por lo menos una vez al mes y en ocasiones de emergencia o crisis, **para expresar sus opiniones oportunamente** en forma ordenada y respetuosa, manteniendo autocontrol, mientras que no interfiera con los procesos de enseñanza de la escuela". (Énfasis suplido) Íd. 11.01(g).

Esos derechos reconocidos en la ley, también obligan a los componentes educativos. Específicamente, la ley obliga a los superintendentes de las regiones educativas a "[p]romover y viabilizar la participación y los acuerdos colaborativos con la comunidad, el tercer sector y otras entidades que repercutan en beneficio de la comunidad escolar y general". Íd., Art. 2.08(t). Así tambien, la ley obliga a los directores escolares a "[p]romover la colaboración, participación e integración de los padres y la comunidad en **la gestión educativa** de la escuela". (Énfasis suplido) Íd., Art. 2.09(m). Igual obligación tiene el consejo escolar. Íd., Art. 6.05(d). Este contempla el rol activo de los padres y madres de estudiantes en la aportación de soluciones y fomenta su participación.

De otra parte, el Art. 6.02 reconoce la importancia de la participación inclusiva al disponer que: el personal

docente y administrativo de la escuela, procurará la participación y colaboración de los estudiantes, padres y la comunidad para la creación de diversos proyectos e iniciativas que impacten positivamente la escuela y enriquezcan la experiencia educativa del estudiante; y que hagan de los planteles centros vibrantes de participación inclusiva. Ciertamente, esa no es la dinámica que se ha exhibido en la implantación del plan de cierre que nos ocupa.

Nótese que todas estas garantías de participar no van dirigidas a establecer un poder de veto de la comunidad escolar, pero sí a que los tomen en cuenta para recoger el insumo y velar que no se atropellen garantías individuales. Nuevamente, esa participación no es abstracta.

De acuerdo a todo lo antes mencionado, entiendo que es hora ya de que la participación ciudadana deje de ser un cliché contenido en declaraciones de política pública pero que a la hora de las agencias ejecutar el mandato constitucional y legislativo no adopten mecanismos que realmente cumplan con esa política pública inheremente ligada al debido proceso de ley y al acceso a la justicia como derecho humano fundamental.

El modelo gerencial de elaboración de planes centralizados conduce a grandes errores. Ese modelo es endeble y está poco fundamentado en la democracia. Así,

existe el reto de reconciliar el peritaje administrativo con la transparencia y la participación ciudadana que exige el modelo democrático. De esta forma, desde San Juan, se puede cerrar una escuela y reubicar a otra escuela que recientemente recibió fuertes embates por el Huracán María. Si no visitamos el campo, si no recogemos el sentir del personal directivo, docente y las comunidades escolares se cometen desaciertos que diluyen el interés legítimo que pueda tener el Estado en su plan. Por tanto, entiendo que es momento de fomentar la teoría de la democracia participativa, la cual enfatiza la importancia de la participación no sólo para influir en la toma de decisiones, sino también para fortalecer la capacidad cívica y el capital social. Sólo de ese modo damos vida a las garantías del debido proceso de ley y el derecho fundamental a la educación.

**VI**

De igual modo, la política pública de la Ley de Reforma Educativa de Puerto Rico, supra, reconoce la interacción que de facto y de jure se da entre las escuelas públicas y los gobiernos municipales. Desvincular la realidad del impacto socioeconómico que tendrán los gobiernos municipales al perder una cantidad sustancial de escuelas es enajenarse de la dinámica que se da en los barrios y comunidades, por ejemplo, de la montaña de Puerto Rico, en los que las escuelas sirven de ese pulmón que da

vida a la economía, a la cultura y al desarrollo socioeconómico de sus residentes y del comercio local.

Habida cuenta que no estuvo en controversia la legitimación de los padres y madres para instar el presente litigio, huelga atender en extenso la controversia en torno a la legitimación activa del Municipio de Morovis. No obstante, adviértase que en el presente pleito están envueltos serios intereses económicos de ese municipio. Ello, pues el cierre de escuelas tiene serias repercusiones sobre las comunidades que estás sirven. N. Stelle Garnett, Disparate Impact, School Closures, and Parental Choice, 2014 U. Chi. Legal F. 289, 316-329 (2014); C.L. Anderson, The Disparate Impact of Shuttered Schools, 23 Am. U. J. Gender Soc. Pol'y & L. 319, 319 (2015); B.R. Nugent, Restorative Justice and School Closures: Recommendations for Facilitating Community Repair After Neighborhood Institutions Are Condemned, 7 DePaul J. for Soc. Just. 205, 205-206 (2014). Además, las aportaciones que realizan los municipios directa e indirectamente en el mantenimiento y sus contribuciones para sostener las operaciones de escuelas resultan incuestionables. En ese proceso, ciertamente, incurren en la erogación de fondos públicos. Por tanto, las acciones estatales que pueden incidir en que gastos de fondos municipales no se utilicen adecuadamente ante el cierre de escuelas y la adecuada planificación de la inversión de los fondos es un asunto legítimo que brinda

también legitimación activa al gobierno municipal. Nótese que esos intereses económicos han permitido en el pasado que un municipio pueda demandar al Estado por una determinación que incide en las finanzas municipales, aun cuando el gobierno municipal no haya formado parte de ese dictamen. Véase, Mun. Fajardo v. Srio. Justicia, 187 DPR 245 (2012).

Por otro lado, según surge de la vista evidenciaria y de la Sentencia del Tribunal de Primera Instancia, la Dra. Yanira I. Raíces Vega, Secretaria Auxiliar de Transformación, Planificación y Rendimiento, testificó que como parte del comité de evaluación del cierre de las escuelas los alcaldes estaban incluidos, pues los municipios ayudan con el mantenimiento de las escuelas públicas. En este caso, según surge del testimonio de la Alcaldesa de Morovis, la Hon. Carmen I. Maldonado González, ese municipio tenía un contrato con el Departamento para el mantenimiento de algunas de las escuelas a cerrar.[92]

**VII**

En el caso ante nos, la controversia se circunscribe a determinar cuál es el procedimiento adecuado, conforme el debido proceso de ley y el derecho constitucional fundamental de la educación, que debe realizar el Departamento para llevar a cabo su facultad de consolidar o

---

[92]Hago constar que favorezco autorizar la comparecencia como amicus curie solicitada por diversos gobiernos municipales.

cerrar escuelas públicas. Por lo que no está en controversia el poder que tiene el Departamento para llevar a cabo la consolidación y cierre de las escuelas. Tampoco está ante nos el debate sobre la preferencia o la política pública que debe imperar en el cierre de las escuelas públicas. Ese debate es un asunto que compete a la arena política. Lo que nos toca resolver es el deber de la Rama Judicial en delimitar las garantías procesales en ese procedimiento de cierre de escuelas.

Luego de examinar detenidamente los escritos de las partes y de analizar el derecho aplicable no puedo más que concluir que no tienen razón los peticionarios. De esa forma, disiento del curso de acción realizado por una Mayoría de este Tribunal y hubiera resuelto que fue violado el debido proceso de ley de los recurridos. Así pues, hubiera confirmado el Tribunal de Primera Instancia, sin perjuicio de que el Departamento realice en el futuro el procedimiento de consolidación y cierre de escuela de acuerdo con lo aquí expuesto.

Como indiqué, en Puerto Rico el derecho a la educación es de rango constitucional. Más aún, es un derecho fundamental. Acorde a ello, este Tribunal está obligado a garantizar y proteger que el Estado no interfiera con ese derecho. De esta forma, toda actuación del Gobierno de Puerto Rico que de una forma u otra incida sobre ese

derecho que tienen nuestros niños y niñas tiene que ser examinada con mucha cautela por los tribunales.

Teniendo en mente lo anterior, debemos recordar que el debido proceso de ley en su vertiente procesal aplica cuando se afecta un interés individual de libertad. Entre ello, se incluye el interés de obtener conocimiento y el de criar a sus hijos. Así, para resolver el caso ante nos correctamente debemos determinar si aplica el debido proceso de ley en su vertiente procesal. No está en controversia que el Departamento determinó consolidar las escuelas en las cuales los recurridos tenían a sus hijos. Asimismo, del examen de la prueba testifical surge claramente que el Departamento informó su determinación por medio de un comunicado oficial publicado en los periódicos, la página electrónica del Departamento y las redes sociales. Incluso, no hay controversia en que se envió comunicación oficial a los directores escolares. No obstante, de la prueba presentada se desprende que los padres y madres no fueron notificados oficialmente de la consolidación. Más aún, el Estado demostró que desconocía si los directores escolares efectivamente entregaron a la comunidad escolar la notificación oficial al respecto. Tampoco el Estado refutó que no hubo participación ciudadana en esos procesos.

Así también, de la regrabación de los procedimientos surge que antes de la determinación por parte de la

Secretaria, ninguno de los recurridos fueron auscultados sobre la consolidación, no fueron notificados efectivamente sobre el proceso ni tuvieron la oportunidad de expresar sus preocupaciones y opiniones al respecto. De esta forma, no hay duda que la actuación del Departamento interfirió indebidamente con  la libertad de los padres a dirigir, criar y educar a los niños y niñas bajo su control. Sin la posibilidad de ser notificados correctamente, los recurridos fueron privados de la libertad de tomar una decisión informada sobre aspectos importantes de la educación y crianza de sus hijos. Por ello, concluyo que le asiste a los padres y madres de estudiantes el derecho de ser notificados oportunamente de las propuestas de cierres de escuelas y todo lo relacionado a ello, a fin participar y tener acceso a la información para realizar una toma de decisiones responsable e informada en asuntos que el Tribunal Supremo federal ha reconocido como medulares, tales como el derecho de crianza de sus hijos e hijas.

De esta forma, como he planteado anteriormente, los padres, madres y estudiantes no tienen, en el caso ante nos, un poder de veto de la determinación del Departamento de Educación. Sí tienen un derecho a ser notificados e informados de acuerdo a los fundamentos antes explicados. Sin embargo, reconozco que podrían tener un derecho de impugnar la determinación de la acción estatal si se demostrara, por ejemplo, que una cantidad sustancial de

estudiantes fueron afectados de su derecho a la educación o que la acción fue por motivos raciales, entre otros.

Adviértase que para realizar efectiva y responsablemente el derecho a criar a los hijos, los padres tienen en nuestra Constitución garantías individuales de participación ciudadana que emanan del acceso a la justicia y el acceso a la información.

Nótese, además, que parte de los integrantes de los recurridos son estudiantes de educación especial. Por tal motivo, se debe tener mayor cautela al atender la controversia ante nos, toda vez que forman parte de una comunidad vulnerable y tienen protecciones estatutarias, según provistas por la Individuals with Disabilities Education Act (IDEA) 20 U.S.C. sec. 1400 et seq (2017). El andamiaje estatutario de IDEA provee para otorgarle fondos federales a los estados que se comprometan en brindarle una educación pública gratuita y apropiada a los estudiantes del sistema público con diversidades funcionales. Una vez el estado acepta la mencionada ayuda financiera, el estudiante adquiere un derecho sustantivo para recibir la misma. Fry v. Napoleon Cmty. Sch., 137 S. Ct. 743, 749 (2017). Para fines de instaurar y garantizar educación pública gratis y apropiada, IDEA exige que se cree para cada estudiante de educación especial un plan de educación individualizado, el cual sirve como el vehículo principal para garantizar esa educación. Íd.

Por otra parte, los estudiantes de educación especial también poseen protecciones según provistas por el Título II de la Americans with Disabilities Act (ADA), 42 U.S.C. sec. 12131 et seq., y la Sec. 504 de la Rehabilitation Act, 29 U.S.C. sec. 794. Tanto ADA como la precitada sección del Rehabilitation Act requieren de las entidades públicas que efectúen modificaciones razonables a sus políticas, procedimientos y prácticas para evitar que discriminen contra las personas con impedimentos. 42 U.S.C. secs. 12131-12132; 29 U.S.C. sec. 794(a). Igual que IDEA, esos estatutos proveen remedios a los individuos afectados por el incumplimiento con éstos. Adviértase que una reclamación bajo IDEA no prohíbe que se reclamen beneficios bajo cualquiera de los dos estatutos antes mencionados. 20 U.S.C. sec. 1415(l); Fry v. Napoleon Cmty. Sch., supra, pág. 750.

IDEA también provee un procedimiento administrativo para la  solución de disputas que surjan en torno a si el programa de educación individualizado para un estudiante en particular es adecuado en función de sus necesidades. En torno a ese particular, existen varios casos en los cuales padres y madres han impugnado determinaciones de las autoridades escolares que, al entender de éstos, menoscaban los derechos de sus hijos bajo IDEA. Véanse, Íd.; Honig v. Doe, 484 U.S. 305 (1988); Smith v. Robinson, 468 U.S. 992(1984); Bd. of Educ. of Hendrick Hudson Cent. Sch.

Dist., Westchester Cty. v. Rowley, 458 U.S. 176 (1982). En ese sentido, recientemente el Tribunal Supremo Federal en Fry v. Napoleon Cmty. Sch., supra, determinó que existen instancias que ameritan precipitar el cauce administrativo con el fin de proveer un remedio con mayor agilidad a las personas que alegan ser privadas de sus derechos a una educación pública gratuita y apropiada. Íd. pag. 754.

De lo anterior, resulta claro que cuando estén en juego los derechos o beneficios, bajo IDEA o ADA, de ciertos estudiantes el estado debe actuar con extrema cautela. Bajo nuestro esquema constitucional ese contenido mínimo federal sirve también de base para reconocer las garantías no obviadas en esta Opinión. Ello, con el fin de que no se vulneren los mismos. El Departamento no probó que haya evaluado o tomado en consideración esos derechos o beneficios. Tampoco se desprende si el Departamento tomó en consideración cómo el mover de plantel escolar afectaría esos estudiantes o si puede proveer igual o mejores servicios en otra escuela. Por el contrario, lo que si consta en el record es que actualmente existen niños que serán trasladados a otras escuelas sin ningún tipo de garantía de que mantendrán sus derechos en igual o mejor grado.

Por lo expuesto anteriormente, es mi entender que no procede permitir una actuación gubernamental a ciegas que lacera y afecta derechos constitucionales fundamentales,

bajo el fundamento de que la misma es de aplicación general y un hecho legislativo. Es decir, no puedo avalar ni permitir una actuación gubernamental absoluta, sin posibilidad de árbitro alguno, en la que no se le proveyó a los recurridos un mínimo proceso, bajo el debido proceso de ley. De esa forma, me niego a concluir que la vía política sea la única alternativa que los recurridos poseen. Son los tribunales los que poseen el deber ministerial de salvaguardar los derechos de aquellos que acuden ante nos. Ante la clara afectación de esos derechos, no podemos quedarnos de brazos cruzados, so pretexto de que la actuación gubernamental en cuestión alegadamente sólo responde a una mera política pública. El cierre de planteles escolares tiene serias repercusiones sobre los estudiantes, los padres y las comunidades que servían. Por tal motivo, entiendo que el debido proceso de ley debió activarse, toda vez que el derecho a la educación de los estudiantes y el derecho constitucional a la crianza y educación de los padres para con sus hijos fue seriamente lacerado ante la falta de participación en la formación del plan para el cierre de planteles escolares.

Además, considero que el Departamento está obligado a realizar un procedimiento administrativo ordenado que promueva un adecuado uso de las facilidades públicas, a fin de que escuelas cerradas no se conviertan en guarida de criminales y en un almacén de valiosos libros y materiales

abandonados, frustrando así el objetivo de maximizar el uso de recursos. Siendo así las cosas, el Departamento debía cumplir con los requisitos exigidos por el debido proceso de ley, a saber, como mínimo una debida notificación y la oportunidad de ser escuchados. Al no cumplirse debidamente, concluyo que los recurridos tenían la razón y procedía el injunction solicitado.[93]

Asimismo, hubiera declarado invalida la Serie C-107 del Compendio debido a que no cumple con el debido proceso de ley que le ampara a los recurridos. Ello, conforme a lo explicado anteriormente. Además, este Compendio está en contradicción con los principios y la política pública que

---

[93]Nuestro Código de Enjuiciamiento Civil dispone lo siguiente:

> Disponiéndose, sin embargo, que el tribunal podrá dictar dicha orden de entredicho provisional, injunction preliminar o permanente sujeto a los términos de la Regla 57 de Procedimiento Civil:
> . . . .
>> (b) Cuando en la petición se alegue que alguna persona, bajo la autoridad de alguna ley, ordenanza, o reglamento del Estado Libre Asociado de Puerto Rico, esté privando o sea el causante de que alguien **esté privando al peticionario de algún derecho**, privilegio o inmunidad protegido por la Constitución o las leyes del Estado Libre Asociado de Puerto Rico o por la Constitución o leyes de los Estados Unidos de América que sean aplicables a las personas bajo la jurisdicción del Estado Libre Asociado de Puerto Rico. (Énfasis suplido) 32 LPRA sec. 3524.

Acorde a lo anterior, al haber una violación a los derechos discutidos en esta Opinión, es incuestionable la aplicación del injunction.

establece la Ley Núm. 85-2018. Como expresé, la ley en toda su extensión promueve la participación de los padres y madres en el proceso educativo de sus hijos y de los propios estudiantes. Además, requiere la participación de todos los sectores de la sociedad, le confiere el derecho a los padres de recibir información sobre **todo lo concerniente a la educación** de sus hijos y a recibir regularmente y tener acceso a la información sobre el desempeño académico **y administrativo de la escuela, de manera clara y transparente.** Sin lugar a duda, información sobre el proceso de consolidación de escuelas, acorde a la propia ley, debió ser ofrecida oportunamente a los padres, madres y estudiantes. Éstos, conforme al derecho constitucional a la educación y al debido proceso de ley, tenían el derecho de ser informados del curso de acción propuesto por el Departamento para de esa forma decidir de forma informada sobre el futuro educativo y de crianza de sus hijos. Al no ser informados oportunamente, los padres, madres y los estudiantes fueron coartados por el Departamento del derecho a decidir responsablemente el futuro educativo de los niños afectados. Estas omisiones tuvieron, tienen y tendrán serias repercusiones sobre los recurridos.

De acuerdo a lo antes mencionado, respetuosamente disiento del curso de acción que hoy decide este Tribunal. En cambio, reitero que perdimos la oportunidad de pautar

clara y definitivamente la importancia del derecho constitucional fundamental a la educación y de delinear las normas y principios que deben regular los procesos cuando el Estado pretenda realizar acciones que incidan sobre la libertad de los padres de educar y criar a sus hijos. Particularmente, perdimos la oportunidad de establecer cuál procedimiento es el adecuado en el contexto de la implantación de planes de cierres de planteles escolares que tanto se han llevado a cabo en la última década. Así pues, no realizamos un adecuado balance de intereses. Como expliqué, teníamos la tarea de balancear el interés del Estado en implantar un plan de cierre de escuelas y, por otro lado, el interés de las comunidades escolares de velar que durante ese proceso se activen unas garantías dirigidas a que el derecho a la educación no sea algo meramente abstracto. De esta forma, debimos reafirmar que los estudiantes tienen garantías dirigidas a evitar un proceso de cierre atropellado y que interfiera con su derecho a la educación. A su vez, desaprovechamos la ocasión para ampliar la aplicación del debido proceso de ley a otros contornos en los cuales es necesario proteger garantías individuales como la participación ciudadana.

Hoy, como resuelve una Mayoría de este Tribunal, le da poderes absolutos al Gobierno de Puerto Rico para que, con la excusa de llevar a cabo una política pública que afecta de manera general a unas escuelas en específico, ignore por

completo unas garantías individuales y tenga la autoridad de vetar el derecho a la educación al momento de implantar normas de cierres de escuelas. De este modo, los tribunales se quedan sin la facultad de delimitar las garantías procesales que tienen las comunidades escolares cuando el Estado invoca su interés apremiante de administrar los asuntos económicos del Departamento.

Es por lo antes explicado que concluyo que le asiste el derecho a los padres y madres de estudiantes de ser notificados oportunamente de las propuestas de cierres de escuelas, a fin de participar y tener acceso a la información para realizar una toma de decisiones responsable e informada como el derecho de crianza de sus hijos e hijas. De esta forma, considero que el Departamento esta obligado a realizar un procedimiento administrativo ordenado que promueva un adecuado uso de las facilidades públicas para maximizar el uso de recursos. De igual modo, se necesita una adecuada transición en la que la coordinación con los componentes de la comunidad escolar quedó, como cuestión de hechos y de derecho, en el olvido.

Por los fundamentos expuestos, hubiera confirmado al Tribunal de Primera Instancia, sin perjuicio de que el Departamento realice en el futuro el procedimiento de consolidación y cierre de escuela de acuerdo con lo aquí expuesto. Al no ser el curso de acción llevado a cabo, **disiento**.


                                        Luis F. Estrella Martínez
                                             Juez Asociado